Charles E. WILKINSON, Appellant,

v.

Jesse BROWN, Secretary of Veterans Affairs, Appellee.

No. 93–1203.

United States Court of Veterans Appeals.

Oct. 20, 1995.

Charles E. Wilkinson, pro se.

Mary Lou Keener, General Counsel, Atlanta, GA; Norman G. Cooper, Assistant General Counsel; Adrienne Koerber, Deputy Assistant General Counsel; and John C. Winkfield, Washington, DC, were on the pleadings for the appellee.

Before FARLEY, MANKIN, and STEINBERG, Judges.

STEINBERG, Judge:

The appellant, veteran Charles E. Wilkinson, appeals a July 12, 1993, Board of Veterans' Appeals (BVA or Board) decision denying the reopening of his claim of entitlement to service connection for a heart condition. Record (R.) at 6–13. The appellant filed an informal brief. The Secretary filed a motion for summary affirmance. For the reasons that follow, the Court will vacate the BVA decision and remand the matter to the Board for further development and readjudication in accordance with this opinion.

## I. Background

The veteran served on active duty with the United States Armed Forces from March 1953 to April 1955. R. at 18. A January 1953 preinduction examination report not included in the record on appeal (ROA) apparently showed the veteran's "heart, chest[,] and vascular system to be normal". *See* R. at 47. In January 1955, the veteran was hospitalized and found to have a cardiac murmur and an atrial septal defect. *Ibid.* He was transferred to Brooke Army Hospital, Texas (BAH), where a "systolic murmur" was heard and chest x-rays revealed an enlarged heart. *See* R. at 47–48 (the ROA does not contain the medical records from the BAH). His blood pressure was reported to be 140/88 and the findings by BAH were "strongly suggestive of congenital heart disease". R. at 47–48. Cardiac catheterization was performed and "the results were consistent with an atrial septal defect, which was held to have preexisted service". *Ibid;* R. at 26, 31. At the time of his discharge in April 1955 he apparently "was asymptomatic and was being separated from the service when a chest film showed cardiac enlargement". *See* R. at 47.

In April 1956, the veteran filed a claim with a Veterans' Administration (now Department of Veterans Affairs) (VA) regional office (RO) for VA disability compensation for a heart condition. R. at 21. The application noted that while in service he had received treatment at BAH during March and

April 1955. R. at 22. A May 1956 VA medical report referred to BAH records and noted a "[h]istory of easy fatigability" that "existed all through his period of service". R. at 26, 31. His complaints then were that he had "difficulty in breathing" and "drainage from [his] nose". *Ibid.* Examination of his cardiovascular system revealed a "harsh septolic murmur" and blood pressure of 132/80. R. at 27. A chest x-ray stated that "[t]he appearance of the heart suggests congenital pathology." R. at 28. The diagnosis was "congenital heart disease, specifically atrial septal defect". R. at 31.

A May 1956 VARO decision denied service connection for "septal defect, atrial". R. at 33. The RO concluded that the veteran's "[c]onstitutional or developmental abnormality [was] not a disability under the law." *Ibid.* In June 1956, the veteran filed a VA Form 1–9 (Substantive Appeal to the BVA) (1–9 Appeal) stating that there was nothing wrong with his heart until he was in Korea, at which time he "began to have shortness of breath" and that neither he "nor anyone else knew of any heart condition until [his] hospitalization early in 1955". R. at 38. A July 1956 RO decision on appeal confirmed and continued the prior denial. R. at 41.

In December 1956, a BVA decision denied service connection for heart disease; the BVA noted that the 1955 BAH records showed a systolic heart murmur and an enlarged heart, findings "strongly suggestive of congenital heart disease", and determined that these "results were consistent with an atrial septal defect, which was held [by the BAH] to have preexisted service." R. at 47–48. The Board found that the evidence did not establish that "the veteran's heart disease manifested by systolic murmur was incurred or aggravated during active service". R. at 48.

In July 1957, VA received a letter from the veteran seeking to reopen his claim and noting that he had been told by his doctor not to work. R. at 51–53. A July 1957 VA hospital report stated that the veteran had been admitted to the hospital from June 26, 1957, to July 15, 1957, with complaints of "mild exertional dyspnea of 6 months duration". R. at 55. (Dyspnea is "[s]hortness of breath, a subjective difficulty or distress in breathing ... [which] occurs normally during intense physical exertion or at high altitude", STEDMAN'S MEDICAL DICTIONARY 480 (25th ed. 1990).) The diagnosis was: "Organic heart disease"; "[e]tiology—congenital anomaly"; "[a]batomy—anomalous pulmonary veins draining into right auricle, possible inter-auricular septal defect". R. at 56. The veteran was admitted to the same VA hospital for approximately one month in December 1957 with complaints of "precordial chest pain" and "shortness of breath". R. at 60. The diagnosis was the same as above. R. at 61, 65. A June 1959 RO decision denying entitlement to VA non-service-connected pension noted that the etiology of the veteran's organic heart disease was congenital and concluded that the disability "neither meets [the] minimum schedular requirement for pension purposes nor is of such severity as to permanently preclude [the] veteran's employment." R. at 68.

A December 1961 VA hospital report stated that the veteran had been admitted for approximately two weeks following complaints of chest pain. R. at 75–76. The diagnosis remained congenital heart disease. R. at 76. A June 1962 private medical report stated that he had been examined the week before and complained of, inter alia, cardiac murmur. R. at 70. The impression was, inter alia, cardiac systolic murmur and hypertension. *Ibid.* A March 1963 RO decision confirmed the June 1959 RO denial. R. at 80, 82.

A December 1966 private medical report from Dr. Robinson of the University Hospital, Ann Arbor, Michigan, included the following diagnosis: (1) "[a]trial septal defect"; (2) "[a]nomalous pulmonary venous connection"; and (3) "[h]ypertension, etiology undetermined". R. at 90. The report noted that "[t]welve years ago the [veteran] first noted dyspnea on exertion and chest pain", and that the "dyspnea has gradually increased in the last 8 years". *Ibid.* His blood pressure was 200/120. *Ibid.* A July 1967 VA examination report noted that a cardiac catheterization had been performed at the University Hospital in December 1966. R. at 84. A VA electrocardiographic record noted a normal

sinus rhythm with "[n]o definite evidence of myocardial damage." R. at 86. A September 1967 RO decision denying entitlement to non-service-connection pension referred to an April 1967 statement from Dr. Leach (not in the ROA) stating that the veteran was under his care for treatment of, inter alia, hypertension and atrial septal defect. R. at 95. An October 1967 letter from Dr. Leach stated what had been referred to as having been stated in the April 1967 statement. R. at 97.

A November 1967 letter from Dr. McSwain stated: "[The veteran] [wa]s ill due to [h]ypertension and has been judged to be permanently disabled because of this [h]ypertension. This extends back to the last of 1964." R. at 102. A February 1968 VA medical report noted that the veteran's father had "died of [a] heart condition at the age of 50", and included a diagnosis of, inter alia, atrial hypertension and septal defect. R. at 111, 117–18. A February 1968 VA chest x-ray report was negative and stated that there was no "cardiac enlargement". R. at 133. April 1968 VA medical records reported a diagnosis of, inter alia, congenital atrial septal defect and hypertension, and noted that the veteran had decided against recommended surgery. R. at 119, 126, 129.

In October 1969, a VA medical examination report included a diagnosis of, inter alia, congenital heart disease and hypertension, more severe. R. at 141–47. A chest x-ray report noted "very little change" from February 1968 and stated that his heart was not enlarged. R. at 148. An October 1969 VA clinical record reported that changes in the veteran's heart condition since 1957 are "suggestive of left ventricular myocardial damage". R. at 149. In a November 1969 letter, the RO stated that this evidence did not warrant any change in the previous denial of service connection. R. at 153–54.

In January 1981, the veteran submitted a statement requesting that his claim for service connection for "aggravation of my heart condition be reopened". R. at 156. He resubmitted the December 1966 medical report from Dr. Robinson (*compare* R. at 158–60 *with* R. at 90–92), and submitted a January 1967 letter from Dr. Clifford of the University Hospital which stated that she had examined the veteran a few days before and noted that "special cardiac studies confirmed the presence of a left to right shunt at the atrial level" and an "anomalous pulmonary venous drainage from the right lung, and probably an associated small, interatrial septal defect", R. at 161. A February 1981 RO decision denying his claim noted that the evidence submitted "d[id] not demonstrate that aggravation of the veteran's ... heart condition [had] occurred during military service." R. at 164, 166. In an appeal to the BVA in April 1981, the veteran stated that he felt that "the Army [had] aggravated the heart condition" to the extent that he had to be hospitalized in January 1955 with an "enlarged heart and a heart murmur". R. at 176.

A December 1981 BVA decision denied service connection for a heart disability. R. at 186–91. The Board found that the evidence received since the 1956 Board decision "does not establish any facts different from those previously found" and that the veteran "did not have hypertension in service or for several years thereafter". R. at 190. The Board concluded that that evidence did not establish "a new factual basis for a grant of service connection for heart disease manifested by systolic murmur" and that a heart disability was not incurred in or aggravated by service. R. at 191.

In January 1991, the veteran submitted a January 1991 private medical letter from Dr. McSwain stating that the veteran had been his patient since "the early 1960s" and noting that the veteran had a "congenital heart disease—a valve defect". R. at 196. The letter further stated that the veteran "should never have been drafted into service"; that "there is no question but that his service experience worsened his condition"; and that his diagnosis was, inter alia, heart disease coronary and chronic hypertension. *Ibid.* A January 1991 RO decision found that the letter was not new and material and denied reopening of the claim. R. at 198, 200. The RO concluded that the evidence showed that the doctor "did not treat [the] vet[eran] for more than 4 years after service" and had not given any "indication of having reviewed [service medical records (SMRs)]". R. at 198.

In October 1991, the RO held a hearing at which the veteran was represented and testified under oath (R. at 205–20) that (1) he had first learned that he had a heart condition when x-rays taken at his separation examination (apparently in January 1955, *see* R. at 47) showed a heart problem (R. at 210); (2) he had first been treated for his heart condition in January 1955 when doctors at the military hospital had told him he had an enlarged heart (R. at 209); (3) he had then been given a catheterization and was told he had "an aseptic [sic] defect" (*Ibid*); (4) before separation he had experienced chest pains while hiking or running but had not paid much attention to it (R. at 211); (5) after discharge, he had received treatment from his family physician (Dr. Matthews), who later died, and had attempted to obtain those records but they no longer existed (R. at 211–12); and (6) he had started receiving treatment from VA in 1957 (R. at 212), at which time he had received a catheterization and declined to have surgery (R. at 213–14). In November 1991, the hearing officer denied reopening of the claim. R. at 217–19.

In January 1992, the veteran submitted a December 1991 letter from Dr. McSwain stating that the veteran had a blood pressure reading of 180/100; that he was permanently and totally disabled due to hypertensive cardiovascular disease; that Dr. McSwain felt that the veteran's high blood pressure "was service connected or at least aggravated by service"; and that "treatment is ongoing". R. at 228. The RO found in January 1992 that that letter constituted new and material evidence and reopened the veteran's claim. R. at 234. The decision also stated that SMRs "establish that the veteran's heart condition is congenital in nature, preexisting military service with no evidence of permanent aggravation during service", and confirmed the prior disallowance. *Ibid.*

In January 1992, the veteran filed a Notice of Disagreement (NOD) and submitted to VA a January 1992 letter from Dr. McSwain that stated:

> We still feel [that the veteran's] service time in 1953 worsened his problem and contributed to the uncontrolled hypertension we have today 200/110. It stands to

reason that this young man should never [have] been in service in the first place, but his 3 years 15 day stay certainly didn't help his interatrial septal defect, which is now causing serious complications.

R. at 240, 264. In the July 12, 1993, BVA decision here on appeal, the Board found that the newly submitted evidence was cumulative and insufficient to reopen the claim for service connection for a heart condition. R. at 8.

## II. Analysis

### A. Generally Applicable Law

■ The Secretary must reopen a previously and finally disallowed claim when "new and material evidence" is presented or secured with respect to the basis for the denial of that claim. See 38 U.S.C. §§ 5108, 7104(b). On a claim to reopen a previously and finally disallowed claim, the BVA must conduct a "two-step analysis" under section 5108. *Manio v. Derwinski*, 1 Vet.App. 140, 145 (1991). First, it must determine whether the evidence presented or secured since the prior final disallowance of the claim is new and material "when viewed in the context of all the evidence, both new and old", *Colvin v. Derwinski*, 1 Vet.App. 171, 174 (1991), and when "the credibility of the [new] evidence" is presumed, *Justus v. Principi*, 3 Vet.App. 510, 513 (1992). Second, if the evidence is new and material, the Board must then review it on the merits "in the context of the other evidence of record" to determine whether the prior disposition of the claim should be altered. *Jones (McArthur) v. Derwinski*, 1 Vet.App. 210, 215 (1991).

■ The Court has synthesized the applicable law as follows: "New evidence" is evidence which is not "merely cumulative" of other evidence of record. *Colvin, supra.* "Evidence is 'material' where [assuming its credibility] it is relevant to and probative of the issue at hand and where there is a reasonable possibility that, when viewed in the context of all the evidence, both new and old, it would change the outcome." *Blackburn v. Brown*, 8 Vet.App. 97, 102 (1995) (citing *Sklar v. Brown*, 5 Vet.App. 140, 145 (1993));

*see also Cox (Billy) v. Brown,* 5 Vet.App. 95, 98 (1993).

 Lay assertions of medical causation cannot suffice to reopen a claim under 38 U.S.C. § 5108. *See Moray v. Brown,* 5 Vet. App. 211, 214 (1993). Where the determinative issue involves either medical etiology or a medical diagnosis, competent medical evidence is required to fulfill the well-grounded-claim requirement of section 5107(a); where the determinative issue (such as the recounting of symptoms) does not require medical expertise, lay testimony may suffice by itself. *See Lathan v. Brown,* 7 Vet.App. 359, 365 (1995) (citing *Grottveit v. Brown,* 5 Vet.App. 91, 93 (1993)); *Magana v. Brown,* 7 Vet.App. 224, 227 (1994); *see also Moray, supra* (applying this rule of law to claims to reopen).

 A Board determination as to whether evidence is "new and material" is a conclusion of law subject to de novo review by this Court under 38 U.S.C. § 7261(a)(1). *See Masors v. Derwinski,* 2 Vet.App. 181, 185 (1992); *Jones,* 1 Vet.App. at 213; *Colvin, supra.* The Court examines newly submitted evidence in light of existing statutes and regulations. *See Chavarria v. Brown,* 5 Vet. App. 468, 471 (1993).

 "New and material" evidence is, by its nature, well grounded. *See Gobber v. Derwinski,* 2 Vet.App. 470, 472 (1992). Where there is new and material evidence to reopen the claim, the Secretary has an obligation to assist the claimant, under 38 U.S.C. § 5107(a), in developing the facts pertinent to the claim. *See ibid.* (audiogram that lacked authentication, except by appellant's own statement concerning its origins, constituted "new and material" evidence sufficient to trigger VA's duty to assist in reopening of claim); *cf. Ivey v. Derwinski,* 2 Vet.App. 320, 322–23 (1992) (duty to assist also attached as to claim to reopen where there is no new and material evidence). When the record is inadequate, the Board is required to remand the case to obtain "further evidence or clarification of the evidence...." 38 C.F.R. § 19.9 (1994); *see Austin v. Brown,* 6 Vet.App. 547, 553 (1994) (recognizing that remands to RO under 38 C.F.R. § 19.9 are "mandatory when the BVA determines that further develop-

ment of the record is essential"); *Littke v. Derwinski,* 1 Vet.App. 90, 92–93 (1990). "Where the record is inadequate for the purpose of fairly deciding the veteran's claim, VA's statutory duty to assist requires it to help a claimant develop the facts pertinent to his or her claim prior to deciding it." *Proscelle v. Derwinski,* 2 Vet.App. 629, 632 (1992); *see King v. Brown,* 4 Vet.App. 519, 522–23 (1993) (holding that appellant had submitted new and material evidence and VA had not fulfilled its duty to assist; applying *Proscelle* in determining that record before BVA was inadequate for determination of service connection; and remanding to BVA for more adequate development of evidence). This duty to assist may include "the conduct of a thorough and contemporaneous medical examination, one which takes into account the records of prior medical treatment, so that the evaluation of the claimed disability will be a fully informed one." *Green (Victor) v. Derwinski,* 1 Vet.App. 121, 124 (1991); *see also Wilson (Lawrence) v. Derwinski,* 2 Vet. App. 16, 21 (1991); *Parker v. Derwinski,* 1 Vet.App. 522, 526 (1991).

Service connection for VA disability compensation purposes will be awarded to a veteran who served on active duty during a period of war, or during a post–1946 peacetime period, for any disease or injury that was incurred in or aggravated by a veteran's active service or for certain diseases that were initially manifested to a degree of 10% or more within a specified presumption period after separation from service. *See* 38 U.S.C. §§ 1110, 1112(a), 1116, 1131, 1137; 38 C.F.R. §§ 3.303(a), 3.306, 3.307, 3.309 (1994). As to "[p]reservice disabilities noted in service", VA regulations provide: "[M]anifestation of lesions or symptoms of chronic disease from date of enlistment, or so close thereto that the disease could not have originated in so short a period[,] will establish preservice existence thereof." 38 C.F.R. § 3.303(c). If a disease or injury preexisted service, the following presumption of aggravation applies:

A preexisting injury or disease will be considered to have been aggravated by active military, naval, or air service, where there is an increase in disability during such service, unless there is a specific find-

ing that the increase in disability is due to the natural progress of the disease.

38 U.S.C. § 1153; *see also* 38 C.F.R. § 3.306(a). As to wartime and post–1946 peacetime service, "[c]lear and unmistakable evidence (obvious or manifest) is required to rebut the presumption of aggravation where the preservice disability underwent an increase in severity during service." 38 C.F.R. § 3.306(b).

### B. Application of Law to Facts

█ 1. **New and material evidence.** In its July 1993 BVA decision, the Board found that three newly submitted medical statements from Dr. McSwain, dated January 1991, December 1991, and January 1992, were "cumulative in nature" and insufficient to reopen the veteran's claim. R. at 8. The January 1991 statement noted that the veteran had been seen by Dr. McSwain since "the early 1960s"; stated that the veteran has a "congenital heart disease—a valve defect"; and concluded that the veteran "should never have been drafted into service" and that his service experience "worsened his condition". R. at 196. The December 1991 statement reported that the veteran's blood pressure was 180/100 and that the blood pressure "was service connected or at least aggravated by service". R. at 228. The January 1992 statement noted that the veteran had a blood pressure rate of 180/100 and continued to be "totally and permanently disabled due to [h]ypertension [c]ordivoscalor [sic] disease", and stated that Dr. McSwain "fe[lt] that the [b]lood [p]ressure was service connected or at least aggravated by service". R. at 228.

In denying the veteran's claim for a service-connected heart condition in its 1956 decision, the Board stated that the BAH records showed a systolic heart murmur and an enlarged heart, findings that the BAH had found "strongly suggestive of congenital heart disease" and "consistent with an atrial septal defect, which was held [by the BAH] to have preexisted service". R. at 47–48. The 1956 BVA decision then concluded that there was no "aggravation or increase in disablement resulting from the preexisting cardiac defect during active service." R. at 48.

In its July 1993 decision, the Board determined that these reports were new and material "in the sense that they were not previously of record and they are probative of the issue of service connection". R. at 11. However, the Board also stated that, when reviewed in the context of all the evidence, they "do not raise a reasonable possibility that they would change the outcome" (*ibid.*), a consideration which the Court notes is a factor in determining materiality. The Board went on to conclude that "these opinions, even if new and material, do not support the reopening of the veteran's claim because there is no reasonable probability [sic] that they would change the outcome." *Ibid.* In reaching this conclusion about a changed outcome, the Board specifically stated:

> On two prior occasions the Board has conducted a comprehensive review of the entire record, including the clinical findings during service, statements of medical history given in conjunction with treatment during and contemporaneous to service, and the extensive clinical findings made during treatment rendered over a period of sixteen years post service. Dr. McSwain's opinions not only lack any articulated rationale, they also are without the slightest support by citation to any clinical findings in service or thereafter, nor are they even shown to have been based upon a review of the entire record.

*Ibid.* Thus, the Board seemed to state both that the medical statements were material and then that they were not.

The Court appreciates the reasons for the Board's apparent confusion as to the principles involved in determining when a medical opinion is "material". In determining whether Dr. McSwain's statements were material, the Board correctly recognized that under *Justus, supra,* the credibility of Dr. McSwain's statements was to be presumed and that the statements must be probative of the issue at hand. However, the Board referred to the Court's opinion in *Cox* and noted that there "the Court held that [the Board is] not required to presume the *weight* to be accorded to these statements". R. at 11. The Board then apparently concluded that the statements were not of **sufficient**

**weight or significance** to create a reasonable possibility that, when viewed in the context of all the evidence, new and old, they would change the outcome, and thus compel reopening.

Even under the Board's analysis (which, as the Court will explain below, mistakenly considered "weight" at the *Manio* step-one phase), however, if the statements were not of sufficient weight they would not be material, and the Board should have so stated. Instead, it stated that the statements were material but that there was no reasonable possibility that they would change the outcome. That conclusion is a contradiction in terms.

The Court's caselaw is clear that only if there is a "reasonable possibility of changing the outcome" can newly submitted evidence be "material". *See Blackburn, Cox,* and *Colvin,* all *supra.* In *Justus,* the Court held that in determining whether evidence is new and material—that is, carrying out step one under *Manio*—the credibility of the evidence is to be presumed. *Justus,* 3 Vet.App. at 513. It further stated:

> This presumption is made *only for the purpose of determining whether the case should be reopened.* Once the evidence is found to be new and material and the case is reopened, the presumption that it is credible and **entitled to full weight** no longer applies. **In the adjudication that follows** the reopening, **the Board** having accepted provisionally for reopening purposes the credibility of the new evidence, then **must determine,** as a question of fact, **both the weight and credibility of the new evidence** in the context of all the evidence, new and old.

*Ibid.* (boldface emphasis added). In *Kightly v. Brown,* the Court explained the *Justus* holding as follows:

> The Court emphasized that its application of the presumption [of credibility] to the medical statement at issue **did not constitute an endorsement of "either the weight or the credibility"** of the statement, and that the determination of the weight and credibility of the evidence "is a question of fact for the Board to decide upon reopening and readjudication with a

statement of reasons or bases for its findings. *See Gilbert [supra].*"

*Kightly v. Brown,* 6 Vet.App. 200, 205 (1994) (emphasis added); *see also Hadsell v. Brown,* 4 Vet.App. 208 (1993) (citing *Justus* in holding that Board erred in determining credibility of physician's statement as part of section 5108 step-one analysis).

However, instead of presuming full weight in determining whether to reopen as provided for in *Justus* and *Kightly,* the Court added in *Cox* that, in order to reopen a claim, newly submitted evidence "must be of **sufficient weight or significance** (assuming its credibility) that there is a reasonable possibility that the new evidence, when viewed in the context of all the evidence, both new and old, would change the outcome". *Cox,* 5 Vet.App. at 98 (emphasis added).

In addition to suggesting that weight could be a factor in the equation for determining materiality for purposes of deciding whether to reopen a claim, the Court in *Cox* also stated: "Once the claim is reopened, then the adequacy of the evidence (new and old) to *establish* service connection is a question of fact for the Board to determine in accordance with the usual rules of adjudication of fact questions—burden of proof, **weight,** credibility, benefit of the doubt, etc." *Ibid.* (boldface emphasis added). The Court has not heretofore focused on the meaning of the reference to "weight" and "significance" in *Cox* as those terms are used in determining whether to reopen a claim as part of the *Manio* step-one phase and the relationship of that *Cox* reference to the directives in *Justus* and *Kightly,* both *supra,* that determination of the "weight" of evidence is to occur at the *Manio* step-two phase.

▉ In attempting to reconcile these somewhat disparate statements from *Cox* and *Justus* and within *Cox* itself, the Court concludes that the factor of the "weight and significance" of reopening evidence is for application in the *Manio* step-one phase **only** in the very limited situation where the evidence adverse to the appellant's claim is so overwhelmingly against the claim that regardless of new and probative evidence, there is no "reasonable possibility" that the claim could

be allowed. *Cf. Soyini v. Derwinski*, 1 Vet. App. 540, 546 (1991) ("overwhelming" evidence in support of result in particular case can make reasons-or-bases deficiency under 38 U.S.C. § 7104(d)(1) nonprejudicial to appellant). Thus, in a case where there was direct, definitive, and very substantial medical evidence that no incurrence or aggravation in service had occurred and the veteran submits new medical evidence as to incurrence or aggravation, only then would it be appropriate for the weight of the new evidence to be factored into the *Manio* step-one analysis to determine whether there is a "reasonable possibility of changing the outcome". *Cox*, 5 Vet.App. at 99. Or, if new medical evidence supporting the claim were based on facts rejected by the Board or RO in a prior final decision, then the old evidence could be said to be overwhelmingly against the claim insofar as those discredited facts were concerned; thus, the new evidence, based on those discredited facts, is given no weight and the claim would not be reopened. *See Reonal v. Brown*, 5 Vet.App. 458, 461 (1993) ("[medical] opinion based upon an inaccurate factual premise has no probative value"). In the instant case, the credibility, that is, the essential correctness and reliability, of Dr. McSwain's three medical statements must be presumed (and weight is not a factor) in the *Manio* step-one analysis because those statements are the **only** medical evidence regarding a nexus to service.

Reviewing de novo the newly submitted evidence, the Court holds that Dr. McSwain's medical statements are new and material. Dr. McSwain opined in January 1991 that the veteran's service had "worsened" his "congenital heart disease" (R. at 196); in December 1991 that the veteran's blood pressure was service connected or at least aggravated by service (R. at 228); and in January 1992 that the veteran's service in 1953 had worsened his problem and contributed to the uncontrolled hypertension and that he "should never have been in service in the first place" (R. at 240). These statements are new because they are the first and only medical evidence that suggests that the veteran's current condition was aggravated by service. *See Hadsell, supra.* They are "material" because they are probative of the issue whether the

veteran's heart condition was aggravated by service, and, presuming their correctness, they create a reasonable possibility of changing the outcome because, when viewed in the context of all the evidence, they indicate that the veteran's current condition could reasonably be connected to service. *See Blackburn, Cox,* and *Colvin,* all *supra.* Moreover, his opinion is unequivocal as to aggravation, rather than merely suggesting a possibility, and he based his medical opinion on his having treated the veteran over a thirty-year period. *Cf. Reonal v. Brown*, 5 Vet.App. 458, 460 (1993). Although the statements do not indicate that they were based upon a review of the medical records from the veteran's service or thereafter, that deficiency is not for consideration in the *Manio* step-one analysis, i.e., whether the statements constitute new and material evidence. The Court therefore holds that Dr. McSwain's statements are new and material evidence that compel the reopening of the previously disallowed claim. Accordingly, the matter must be remanded for the Board to adjudicate the reopened claim on the merits and provide an adequate statement of reasons or bases pursuant to 38 U.S.C. § 7104(d)(1); *Caluza v. Brown*, 7 Vet.App. 498, 506 (1995); *Gabrielson v. Brown*, 7 Vet.App. 36, 39–40 (1994). *See Duran v. Brown*, 7 Vet.App. 216, 222 (1994) (holding that new and material evidence had been submitted and remanding claim to Board for VA to fulfill duty to assist and Board to adjudicate merits).

2. **Duty to assist.** On remand, prior to readjudicating the claim on the merits as part of the second step of *Manio, supra,* the Secretary's duty to assist under section 5107(a) must be carried out. *See Moray, supra.* In light of the Board's implicit finding that Dr. McSwain's medical opinions lacked credibility, the duty to assist includes a duty further to "develop the case and seek further medical evidence to be placed in the record that would either support or repudiate the evidence from [Dr. McSwain]...." *Obert v. Brown*, 5 Vet.App. 30, 33 (1993) ("The presentation of a well-grounded claim triggers a necessity to seek *medical evidence* either to verify or not verify the claim."); *see also* 38 C.F.R. § 19.9; *King* and *Proscelle,*

both *supra*. The further development should include "the conduct of a thorough and contemporaneous medical examination, one which takes into account the records of prior medical treatment, so that the evaluation of the claimed disability will be a fully informed one", *Green, supra*, and the examiner should be asked for a specific opinion on whether the appellant's congenital heart condition increased in severity during service. If such an increase is found, the Board may wish to seek to clarify whether such worsening advanced beyond its natural progress, a factor Dr. McSwain did not explicitly address but seemed to imply. *See* R. at 196; 38 C.F.R. §§ 3.303(c), 3.306(a).

### III. Conclusion

Upon consideration of the record and the submissions of the parties, the Court vacates the July 12, 1993, BVA decision and remands the matter for expeditious further development and readjudication, on the basis of all applicable law and regulation, *see* 38 U.S.C. §§ 5107(a), 5108, 7104(a), (b), (d)(1); 38 C.F.R. §§ 3.303(c), 3.306(a), 19.9; *Fletcher v. Derwinski*, 1 Vet.App. 394, 397 (1991), and issuance of a readjudicated decision supported by an adequate statement of reasons or bases—all consistent with this opinion and in accordance with section 302 of the Veterans' Benefits Improvements Act, Pub.L. No. 103–446, § 302, 108 Stat. 4645, 4658 (1994) (found at 38 U.S.C. § 5101 note) (requiring Secretary to provide for "expeditious treatment" for claims "remanded" by BVA or Court). *See Allday v. Brown*, 7 Vet.App. 517, 533–34 (1995). "On remand, the [claimant] will be free to submit additional evidence and argument" on the remanded claim. *Quarles v. Derwinski*, 3 Vet.App. 129, 141 (1992). A final decision by the Board following the remand herein ordered will constitute a new decision which, if adverse, may be appealed to this Court only upon the filing of a new Notice of Appeal with the Court not later than 120 days after the date on which notice of the new Board final decision is mailed to the appellant.

VACATED AND REMANDED.