Douglas B. COHEN, Appellant,

v.

Jesse BROWN, Secretary of Veterans
Affairs, Appellee.

No. 94–661.

United States Court of Veterans Appeals.

Argued April 16, 1996.

Decided March 7, 1997.

As Amended April 8, 1997.

Karen L. Tomlinson, Philadelphia, PA, for appellant.

Alice M. Fent, with whom Mary Lou Keener, General Counsel; Ron Garvin, Assistant General Counsel; and David W. Engel, Deputy Assistant General Counsel, were on the brief, Washington, DC, for appellee.

Before NEBEKER, Chief Judge, FARLEY and STEINBERG, Judges.

STEINBERG, Judge:

The appellant, Vietnam veteran Douglas Cohen, appeals a May 2, 1994, Board of Veterans' Appeals (BVA or Board) decision denying service connection for a psychiatric disorder, including post-traumatic stress disorder (PTSD). Record (R.) at 14. For the reasons that follow, the Court will vacate the BVA decision, reverse it in part, and remand the matter for proceedings consistent with this opinion.

## I. Background

The veteran had active service in the U.S. Army from January 1968 to September 1969. R. at 24. He served in Vietnam from July 1968 to June 1969 with the 56th Supply Company in Da Nang (R. at 82, 138–39, 181) and was awarded the National Defense Service Medal, Vietnam Service Medal, Vietnam Campaign Medal, two Overseas Bars, and an

Expert Badge with Rifle Bar (R. at 24, 140). His military occupational specialty (MOS) was power generator equipment mechanic. R. at 24, 139. His induction medical examination report did not indicate any psychiatric problems. R. at 26–29. At his September 1969 separation physical examination, no psychiatric problems were reported either by him or the examiner. R. at 30–33. He was released from service for hardship and given an honorable discharge. R. at 24.

In February 1989, the veteran filed with a Veterans' Administration (now Department of Veterans Affairs) (VA) regional office (RO) a claim for "[PTSD]—1986". R. at 61. The VARO requested further information with respect to his claim in April 1989. R. at 67–68. Less than three months later, in July 1989, the RO denied the claim. R. at 75. In an August 1989 statement, the veteran responded to the RO's inquiry by explaining that although he was assigned an MOS of power generator equipment mechanic he "never performed these duties" and that "most of [his] duties consisted of convoys, heavy equip[ment] mechanic [and] guard duty". R. at 82. The military experiences he said he had considered "most terrifying, life threatening, or stressful" included the following: (1) Armed combat or enemy action; (2) mortar and rocket attacks; (3) treating or dealing with casualties; (4) convoys; and (5) many hours of work and lack of sleep. *Ibid.* He stated that, during his last 90 days in Vietnam, he was on night guard duty that brought him "closer to the attacks than the rest of [his] company" and that:

> One night in early June we were hit with many mortars and rockets. The rockets were frequent and very close. I felt death was soon. I do not remember how long it lasted. The next morning I saw the results of the attack. Some of the guys from our company and myself drove to the Navy's docking area in Da Nang called deep water pier, where the attacks did the most damage. My friend and I knew the guys that worked at the pier, because some of our convoys either drop[p]ed off or picked up equipment there. When we got there, they were still looking for parts of the[ ] bodies of the dead. There was tremendous damage to the Navy com-

pound, and many Vietnamese civilians were also killed.

R. at 83–84. He also stated that he had befriended a young Vietnamese boy who had been taken away by military police for questioning. R. at 84. He reported feelings of guilt for surviving, frustration at "being unable to fight back at the enemy", and thankfulness that his company was only once in a "firefight". *Ibid.* He stated that he had reexperienced events of his service, described above, in nightmares and flashbacks over the past 20 years. R. at 86.

A July 1989 psychiatric report prepared for the New York State Department of Social Services by a private psychiatrist, Dr. Robinson, noted that the veteran had been examined and treated during 16 sessions from November 1988 until June 1989. R. at 97. As to the veteran's military history, the report stated:

> During his duty in Vietnam, he was assigned to security duty to protect one of the airfields where his unit was subject to constant daily severe bombardment with mortars and missiles. He saw many of his fellow soldiers killed and wounded severely in these actions[,] and it was related to these experiences that he first began to experience "blackouts and loss of memory" for what happened on several occasions. . . . [O]n at least one occasion [he] had the feeling that he was actually dead following a violent explosion which occurred very close to him. Severe sleep difficulties with nightmares also are dated as beginning at that time.

> After returning from Vietnam and [while] stationed in Washington, D.C., he was ordered to participate in funeral and burial ceremonies which he refused on the basis that he was not able to tolerate involvement with dead people and was therefore given a penalty by reducing his rank down to Private First Class from that of Sergeant. This is also considered as further evidence that he was already suffering from symptoms of his past illness at that time.

R. at 98. Dr. Robinson identified, inter alia, the following symptoms in the veteran: (1)

An inability to control anger and violent behavior; (2) an inability to concentrate and recurrent thoughts about his Vietnam experiences; (3) difficulty with sleeping; (4) loss of memory "for what happened during various periods of time during periods of extreme stress and shelling by the enemy" during the war; and (5) avoidance of crowds and social events. R. at 98–101. He noted the veteran's "horrifying feelings and symptoms since his Vietnam experience." R. at 99. It was Dr. Robinson's impression that the veteran needed "long[-]term treatment over an indefinite period of time"; that he was "100% disabled for gainful employment by his illness"; and that he was a "danger both [as] to violent and aggressive behavior toward others as well as continuing to be a strong suicidal risk." R. at 100. The diagnoses were PTSD, "chronic and severe"; intermittent explosive disorder secondary to PTSD; and dysthymia with suicidal tendencies. R. at 101.

In September 1989, the RO received VA medical records showing that the veteran had been hospitalized from May 30, 1989, to June 2, 1989, on referral by Dr. Robinson, at the VA Medical Center (MC) in Buffalo, New York, for "[r]age attacks" and "[p]ersonality disorder". R. at 110. The veteran's reported history at that time included a two-year period of "uncontrollable bouts of anger resulting in physical altercation and destruction of several objects". *Ibid.* He was considered to be fully employable upon discharge. *Ibid.*

Based on two clinical interviews conducted in December 1989 and a review of the veteran's medical records and his claims file, Robert Young, a clinical social worker at the Buffalo VAMC, prepared a social survey at the request of the RO. R. at 126. As part of the veteran's history, the report noted that, after joining his unit in Vietnam and meeting Gerald Remsnyder, the veteran had learned that his MOS was not needed by his unit, and he had been assigned to work as a heavy-equipment mechanic on convoys. *Ibid.* The report recounted:

> He states that his first [experience with hostile] fire occurred on his third day in country. There were mortars from Mar-ble Mountain. They frequently received harassing fire that was meant to disrupt sleep. He worked convoys bringing in new trucks, jeeps, tanks, and armored personnel carriers. There were periods of sniper fire.... He states that his most traumatic experiences were: (1)[D]oing a convoy to the Navy's deep water p[i]er that had been hit by mortars and rockets. They arrived when people were gathering the body parts of a friend of his. An LST [ (Landing Ship Transport) ] was broken in half by the 8 mm. fire. He states that he saw the body of a "gook" hung on a phone pole in retaliation.... (2) ... While on guard duty, his area came under rocket fire. He hid under a tank, lost sense of time, and thought that death would be a relief. He thought he was going to die. When he came out from under the tank, gun ships attacked Monkey Mountain.

R. at 126–27. Mr. Young also stated that the veteran had reported that the mortars prevented him from sleeping; that he was "intensely frustrated over the harassing mortar fire and his inability to retaliate"; and that, upon his returning from leave for rest and recuperation (R & R), Da Nang was under fire, forcing his plane to land so he "ran into the fire" and had no further memory until he rejoined his company. R. at 127. Mr. Young noted primary symptoms of "psychic numbing", flashbacks to experiences in Vietnam, intrusive thoughts, sleep disturbance and nightmares, rages, intense survival guilt, amnesia associated with aggressive rages, depression, and suicidal ideation. R. at 127–28. The symptoms are reported as having been "ongoing since his service in the Republic of Vietnam with a recent exacerbation while on the job." R. at 128. The report noted: "While in Vietnam, he was exposed to combat stress which jeopardized his life resulting in dissociation and amnesia." *Ibid.* Mr. Young concluded that the veteran's "symptoms and reactions are consistent with [PTSD]" and that his diagnostic impression "totally concurs with Dr. Robinson's diagnosis". *Ibid.*

A February 1990 VA medical examination report recorded the veteran's complaints of, inter alia, nightmares, panic attacks, flashbacks, and problems with anger. R. at 124.

At that time, Dr. Singh, a VA consulting psychiatrist, reviewed Dr. Robinson's report, the social survey, and the claims file; noted the veteran's account of the previously referenced incidents in Vietnam, including having his "unit ... hit several times by mortars and rockets"; stated that the veteran had "survival guilt" and "middle, terminal[,] and initial insomnia"; noted that the veteran was on medication to control his rage attacks and that he "cannot watch war movies" and "gets intrusive thoughts of Vietnam"; and diagnosed him with PTSD, "chronic, delayed type". R. at 129–30.

In response to an RO inquiry concerning the veteran and his PTSD claim, the U.S. Army & Joint Services Environmental Support Group (ESG) in July 1990 enclosed an extract from the U.S. Naval Support Activity, Da Nang Command History 1969, and stated: "[That report] supports [the veteran's] statement concerning the June 1969 attack on the Deep [W]ater [P]iers in Da Nang. However, the history states there were no personnel casualties." R. at 150. The ESG also stated:

All U.S. installations in Vietnam were within enemy rocket range[,] and most were within mortar range. It was uncommon for a veteran to have served in Vietnam without having been rocketed or mortared during the time he served there. Most major U.S. installations in Vietnam were many square miles in size. A PTSD claim involving mortars and rockets must be put in the context of the personal involvement by the veteran.

Convoys on main U.S. supply routes were subject to mining, sapper, ambush, and sniper attacks. A PTSD claim concerning such incidents must be put in the context of the personal involvement of the veteran. We need full names of casualties and unit designations in order to attempt to document this type of incident.

The Vietnam era records are often incomplete and seldom contain information about civilian incidents. The killing, accidently or in combat, of civilians is extremely difficult to verify. Incidents involving civilians, or civilian establishments, unless reported, are not normally found in combat

records. Also, the records do not contain information such as dead enemy soldiers being hung on phone poles. This type of brutality is extremely difficult to verify unless reported.

It is not uncommon for veterans with noncombat/combat support specialities to claim combat experiences. While such claims may be completely true, it is very difficult to verify these cases from military records. ESG is unable to document that Mr. Cohen was a perimeter guard, participated in combat actions, or handled casualties. We can only verify, by his Form 20, that he was a Power Generator Equipment Mechanic assigned to a Supply Company during his Vietnam tour. Please refer to Section V, Paragraphs 2 & 9 in the PTSD Guide.

. . . .

Anecdotal incidents, although they may be true, are not researchable. In order to be researched, incidents must be reported and documented. . . .

The PTSD unit can verify only specific combat incidents as recalled by the veteran. In order to conduct meaningful research, the veteran must provide the "who, what, where[,] and when" of each stressor. R. at 150–51. With respect to the attack, the extract stated: On June 15, 1969, "the Deep Water Piers came under attack by 122mm rockets fired from the vicinity of the Hai Van Pass. Six rounds impacted within the Deep Water Piers (DWP) compound, causing minor damage to the fork lift shop, dispatcher's office[,] and a MOGAS tank. There were no personnel casualties." R. at 155.

An October 1990 RO decision denied service connection for PTSD. R. at 157–58. In December 1990, the veteran filed a Notice of Disagreement (R. at 163), and in March 1991 he filed a VA Form 1–9 (Substantive Appeal to BVA) (R. at 173). At an April 1991 hearing before the RO on appeal to the BVA, the veteran gave sworn testimony that while serving in Vietnam he had worked outside his MOS and carried an M–14 weapon in Vietnam (R. at 181–83); that in May 1969, while he was landing on return from R & R at the Da Nang air base, the base was under enemy attack and "all hell was breaking

loose" and "everybody [on the plane] just jumped up in different directions and from there I have no memory of ... what happened", including how "I got back to my unit" (R. at 183–84); and that he had been under sniper fire whenever he had gone "out in the field" to recover a disabled vehicle or to try "to fix it on the spot" (R. at 185). He also testified that he had lost sleep in Vietnam because he was "over alert about noises or ... any sound that could awaken" him and that his unit would come under mortar fire approximately 2 or 3 times a week, lasting about 10 to 15 minutes; he described the mortar fire as "more of a harassment ... than a life[-]threatening situation. Even though we had a ... few guys wounded under ... the attack, it was more of a harassment procedure." R. at 185–86.

At the hearing, the hearing officer reviewed a videotape of a film taken by the veteran that recorded events in Da Nang, specifically, the veteran testified, including the aftermath of an attack on the DWP showing "ships blown out of the water" and the area where people he knew were killed. R. at 191. He stated, however, that he did not know the names of those people. R. at 187–88. In an April 1991 written statement, Mr. Remsnyder verified that he and the veteran had been stationed at Da Nang Army base in Vietnam in 1968 with the 56th Supply Company; that, while stationed there, his unit had "encountered numerous mortar and rocket fire [episodes] ... in the neighborhood of 3 to 4 times per week"; and that a "majority of these encounters were [in the] early morning hours, causing the men in our unit to scurry to our bunkers for safety" and causing "many a sleepless night". R. at 195. A July 1991 decision by the hearing officer denied the veteran's PTSD claim and specifically confirmed the October 1990 RO decision. R. at 198.

Dr. Robinson provided a March 1993 updated psychiatric report stating that he had examined the veteran during the previous year on three occasions and noting that the veteran continued to have group therapy treatment with other Vietnam veterans. R. at 215. Dr. Robinson's psychiatric findings as to the veteran included "a high level of

anxiety and constant alertness"; irritability; constant fear of "losing control of his reactions[ ] and possibly hurting someone or killing somebody"; a "tendency to los[e] control of his anger" and resort to violent behavior; chronic depression; and constant ringing in his ears, causing irritability and loss of concentration. R. at 215–16. With respect to the veteran's reported difficulty in remembering past and current events, including experiences in Vietnam that "involved being in great danger from mortar and rocket attacks", Dr. Robinson opined that this meant that the veteran had "suffered severe psychological disassociation in the form of amnesia and the loss of awareness of his own emotions which occurred at the time of these experiences." R. at 216. The psychiatrist emphasized that "these types of abnormal psychological symptoms are quite common in severe [PTSD] seen in combat war veterans or other types of severe psychological trauma." *Ibid.* He provided the following impression:

> Finally[,] I would like to emphasize that it is my very definite impression that this man continues to suffer with severe [PTSD], complicated by recurrent suicidal tendencies and explosive rage and violence. It is also my impression that these mental difficulties are directly related to his experiences in the war and therefore are service connected. In regard to treatment, there is no question about this man's need for ongoing psychiatric care for the indefinite future.

*Ibid.* The veteran expressly waived RO adjudication of the newly submitted evidence on appeal. R. at 218; *see* 38 C.F.R. § 20.1304(c) (1996).

At a March 1993 hearing before the Board, the veteran and his wife gave sworn testimony. R. at 220–55. The veteran testified that after arriving at his unit, he was assigned to be a generator repairman but never did that job; instead, he did mechanical work in convoys and, for 3 or 4 times a month, he did "perimeter watch". R. at 223–24. During those times, he was not fired on, but "may have been sniped at a few times" and was constantly under mortar attack. R. at 224. He also testified that he was often subjected

to incoming fire while he was in base camp, approximately 3 to 4 times a week, mostly at night; that on each night after an attack he always had trouble sleeping; and that he saw a "guy next to [him]" get wounded, but not so badly, with "some shrapnel through the leg and that was it". R. at 226.

He again described the contents of the videotape that he said included the aftermath of the DWP attack. R. at 227. He stated that some Navy friends were killed there but that he did not actually see any of them except "through the gate" because "they wouldn't let us in" and that this caused him to feel "numb". R. at 228–29. He testified that he saw approximately 6–10 people killed or dead while he was in Vietnam. R. at 229. Other testimony concerned events about which he had previously testified at the RO, specifically the description of the attack at Da Nang when the plane on which he was returning from R & R had been forced to land because of the attacks and he had gotten off the plane, while under fire, without any weapon. R. at 228, 241. He also testified about his violent tendencies, his depression, and his poor relationships with people. R. at 235–42. He stated as to asserted stressors:

> [T]he attacks they might not be tremendous stressors but the constant mortaring, not being able to go to sleep, work all day, go on convoys, you're in the heat, you're in the rain and when you get back you wait for the mortars and you just wait and wait and you may not have them and you may have them but you just—you're waiting, you're just ready to go to the bunker and it just bothered me.

R. at 243. He testified that the stressors in Vietnam were the rocket attacks and that "one time during a close rocket attack . . . I think I went crazy because when the rockets were coming closer, I thought I was going to die and I told this to a psychiatrist." R. at 243–44. He also stated that in 1989 he started receiving Social Security disability benefits because of his unemployability due to PTSD. R. at 247–48.

In the May 1994 BVA decision here on appeal, the Board, after reviewing the evidence de novo, found the claim for service

connection for an acquired psychiatric disorder, including PTSD, well grounded but denied the claim on the merits. R. at 7, 14. The Board concluded that an acquired psychiatric disorder was not present during service or within one year following the veteran's separation from service. R. at 6. The Board also found that the evidence did not show that the veteran "had a combat occupational specialty or that he was assigned to a unit which was involved in combat operations" (R. at 8) and that the evidence did not show that "the veteran has PTSD resulting from exposure to a stressor or stressors during service" (R. at 7).

Following oral argument on April 16, 1996, the parties submitted supplemental memoranda on April 25 and 26, 1996, with respect to the Supplemental Record filed on April 16, 1996.

## II. Analysis

### A. Well–Grounded Claim

 Section 5107(a) of title 38, U.S.Code, provides in pertinent part: "[A] person who submits a claim for benefits under a law administered by the Secretary shall have the burden of submitting evidence sufficient to justify a belief by a fair and impartial individual that the claim is well grounded." The Court has defined a well-grounded claim as follows: "[A] plausible claim, one which is meritorious on its own or capable of substantiation. Such a claim need not be conclusive but only possible to satisfy the initial burden of [section 5107(a) ]." *Murphy v. Derwinski,* 1 Vet.App. 78, 81 (1990). A well-grounded service-connection claim generally requires medical evidence of a current disability; medical or, in certain circumstances, lay evidence of in-service incurrence or aggravation of a disease or injury; and medical evidence of nexus between an in-service injury or disease and a current disability. *See Caluza v. Brown,* 7 Vet.App. 498, 506 (1995), *aff'd per curiam,* 78 F.3d 604 (Fed.Cir.1996) (table). For purposes of determining whether a claim is well grounded, the evidence is generally presumed to be credible. *See Robinette v. Brown,* 8 Vet.App. 69, 75–76 (1995) (citing *King v. Brown,* 5 Vet.App. 19, 21 (1993)).

■ Where the determinative issue involves either medical etiology (such as with respect to a nexus between a current condition and an in-service disease or injury) or a medical diagnosis (such as with respect to a current disability), competent medical evidence is generally required to fulfill the well-grounded-claim requirement of section 5107(a) that the claim be "possible" or "plausible". *Grottveit v. Brown,* 5 Vet.App. 91, 93 (1993); *see Caluza, supra.* Where the determinative issue does not require medical expertise, lay testimony may suffice by itself (such as in the recounting of symptoms or, in certain circumstances, attesting to in-service incurrence or aggravation of a disease or injury). *See Caluza, supra; Heuer v. Brown,* 7 Vet.App. 379, 384 (1995) (citing *Grottveit, supra* ). A Board determination whether a claim is well grounded is a conclusion of law subject to de novo review by the Court under 38 U.S.C. § 7261(a)(1). *See Grivois v. Brown,* 6 Vet.App. 136, 139 (1994); *Grottveit, supra.*

■ Based on the facts of this case, the Court holds that the appellant satisfied his initial burden of submitting a well-grounded PTSD claim because he has submitted medical evidence of a current disability; lay evidence (presumed to be credible for these purposes) of an in-service stressor, which in a PTSD case is the equivalent of in-service incurrence or aggravation; and medical evidence of a nexus between service and the current PTSD disability. *See Caluza, Heuer,* and *King,* all *supra.* Specifically, the record contains several current diagnoses of PTSD by both private and VA psychiatrists. R. at 98, 101, 128, 130, 216. In addition, the record contains the veteran's lay statements and sworn hearing testimony to the effect that although his MOS was power generator mechanic he never performed that duty but instead did convoy and guard duty, was subjected to frequent mortar and rocket attacks (supported by Mr. Remsnyder's statement (R. at 195)), and was exposed to significant stressors during his service in Vietnam. Finally, the record contains the opinion of one psychiatrist, Dr. Robinson, who stated that the veteran's PTSD symptoms were "directly related to his experiences in the war" (R. at 216), and by Mr. Young whose diagnostic impression "totally concurs with Dr. Robinson's diagnosis". R. at 98, 101, 128, 130, 216. This medical evidence of a generalized connection between the veteran's PTSD and his war experiences is sufficient to provide the requisite medical evidence of a nexus between service and a current disease that is necessary under *Caluza* to well ground a PTSD claim.

■ The Court notes that the Board's May 1994 decision was correct in considering the claim now on appeal as the original claim for service connection for PTSD (rather than as one to reopen as characterized by the RO in its October 1990 decision) because the RO's July 1989 decision was premature and cannot be considered a final unappealed decision denying the veteran's original February 1989 PTSD claim. R. at 6. After receiving the veteran's February 1989 application for service connection for PTSD, the RO in April 1989 requested further information from him with respect to his claim. Although he was then entitled, pursuant to 38 C.F.R. § 3.158 (1988), to one year to respond, the RO nonetheless issued a decision on his claim in July 1989, within three months after the RO's letter of inquiry. The veteran responded in August 1989, well within the one-year period, and then, in October 1990, the RO denied his claim and incorrectly characterized it as one to reopen.

### B. Evaluation of PTSD Claim

■ Adjudication of a well-grounded claim for service connection for PTSD requires the evaluation of the evidence in light of the places, types, and circumstances of service, as evidenced by service records, the official history of each organization in which the veteran served, the veteran's military records, and all pertinent medical and lay evidence. *See* 38 U.S.C. § 1154(a); 38 C.F.R. §§ 3.303(a), 3.304(f) (1996); *see also Hayes v. Brown,* 5 Vet.App. 60, 66 (1993). With respect to injuries or disabilities incurred in or aggravated during combat, including psychiatric disabilities, the Secretary is required to accept as sufficient proof of service connection "satisfactory lay or other evidence of such injury or disease, if consistent with the

circumstances, conditions, or hardships of such service, notwithstanding the fact that there is no official record of such incurrence or aggravation in such service". 38 U.S.C. § 1154(b); 38 C.F.R. § 3.304(d) (1996); *see Zarycki v. Brown*, 6 Vet.App. 91, 97 (1993); *Hayes*, 5 Vet.App. at 66. Section 1154(b) provides a factual basis upon which a determination can be made that a particular disease or injury was incurred or aggravated in service but not a basis to link etiologically the condition in service to the current condition. *See Libertine v. Brown*, 9 Vet.App. 521, 524 (1996); *Caluza*, 7 Vet.App. at 507. Although the provision does not establish service connection for a particular disability of a combat veteran, it aids the combat veteran by relaxing the adjudicative evidentiary requirements for determining what happened in service. *See id.* at 508; *see also Collette v. Brown*, 82 F.3d 389, 392 (Fed.Cir.1996) (noting that § 1154(b) "does not create a statutory presumption that a combat veteran's alleged disease or injury is service-connected", but "considerably lighten[s] the burden of a veteran who seeks benefits for an allegedly service-connected disease or injury and who alleges that the disease or injury was incurred in, or aggravated by, combat service"); *cf. Jensen v. Brown*, 19 F.3d 1413, 1417 (Fed.Cir.1994) (38 C.F.R. § 3.306, derived from § 1154(b), creates a presumption of aggravation but "not service-connection, or even that the determination of aggravation is irrebuttable").

***1. Requisite elements of PTSD claim.*** VA regulations in 38 C.F.R. § 3.304 that deal expressly with the adjudication of PTSD claims provide, in pertinent part, as follows:

(f) *Post-traumatic stress disorder.* Service connection for posttraumatic stress disorder requires medical evidence establishing *a clear diagnosis of the condition, credible supporting evidence that the claimed in[-]service stressor actually occurred, and a link, established by medical evidence, between current symptomatology and the claimed in[-]service stressor.* If the claimed stressor is related to combat, service department evidence that the veteran engaged in combat or that the veteran was awarded the Purple Heart, Combat Infantryman Badge, or similar combat citation will be accepted, in the absence of evidence to the contrary, as conclusive evidence of the claimed in[-]service stressor.

38 C.F.R. § 3.304(f) (1996) (boldface-italic emphasis added).

■ In sum, eligibility for a PTSD service-connection award requires the presence of three elements: (1) A current, clear medical diagnosis of PTSD (presumed to include the adequacy of the PTSD symptomatology and the sufficiency of a claimed in-service stressor, discussed below); (2) credible supporting evidence that the claimed in-service stressor actually occurred; and (3) medical evidence of a causal nexus between current symptomatology and the specific claimed in-service stressor. *See ibid.; Moreau v. Brown*, 9 Vet.App. 389, 394–95 (1996).

■ Although the current regulation, § 3.304(f), the first of its kind in the C.F.R. for PTSD, was effective May 19, 1993 (*see* 58 Fed.Reg. 29,109, 29,110), and thus was not applicable when the veteran took his appeal to the BVA in 1991, the VA Adjudication Manual provisions then in effect required essentially the same three elements. *See* VA ADJUDICATION PROCEDURE MANUAL, M21–1 [hereinafter MANUAL M21–1], Subchapter (Subch.) XII, ¶ 50.45 (Jan. 25, 1989) (providing that service connection for PTSD requires diagnosis showing history of stressful events which are thought to have caused condition and description of past and present symptoms (including a description of "the relationship between past events and current symptoms" in terms of "a link between current symptoms and an in[-]service stressful event(s)")); *see also* MANUAL M21–1, Part VI, ¶ 7.46 (Oct. 11, 1995) (reiterating three PTSD service-connection requirements set forth in regulation § 3.304(f)). Hence, no question arises as to whether all three elements of a PTSD claim are required to be met in this case. As a general matter, the veteran is entitled to have his case adjudicated under whichever regulatory or Manual M21–1 provision would be more favorable to him in light of regulatory change (not specifically made prospective only) while his case was on appeal to the BVA. *See Karnas v. Derwinski*,

1 Vet.App. 308, 312–13 (1991) ("where the law or regulation changes after a claim has been filed or reopened but before the administrative or judicial appeal process has been concluded, the version most favorable to appellant should ... apply unless Congress provided otherwise or permitted the Secretary ... to do otherwise and the Secretary did so"); *Fugere v. Derwinski*, 1 Vet.App. 103, 109 (1990) (without adherence to Administrative Procedure Act notice-and-comment process and specific notice to the public of intent to revoke Manual M21–1 provision protecting benefit entitlement, Secretary cannot revoke that provision); *see also Austin v. Brown*, 6 Vet.App. 547, 554–55 (1994) (discussing 38 C.F.R. § 1.551(c)'s prohibition against *adversely* affecting anyone by matter not published in Federal Register).

This Court previously has held that the Manual M21–1 provisions in paragraph 7.46 dealing with PTSD are substantive rules that are "the equivalent of [VA][r]egulations". *Hayes*, 5 Vet.App. at 67. The adoption of the specific PTSD C.F.R. regulation in May 1993 rendered moot the Manual M21–1 provisions regarding PTSD adjudications except where the Manual M21–1 is more favorable to the claimant. *See Hayes, Austin, Karnas*, and *Fugere*, all *supra*. Where the Manual M21–1 imposes requirements not in the regulation that are unfavorable to a claimant, those additional requirements may not be applied against the claimant. *Ibid.* They are not for further consideration and should not be used. Where the Manual M21–1 and the regulation overlap, the Manual M21–1 is irrelevant. In view of these principles, the Court generally will discuss the Manual M21–1 in this opinion only where it might be read as more favorable to the veteran.

**a. Current medical diagnosis:** As to the first PTSD-service-connection element (a clear, current diagnosis of PTSD), at a minimum, a "clear diagnosis" should be an "unequivocal" one. The § 3.304(f) PTSD regulation neither specifies the criteria for "a clear diagnosis of PTSD" nor makes reference to the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM). When this case began in 1989 and at the time of oral argument in this case, VA regulations in

38 C.F.R. § 4.125 (1989) and (1995) relating to mental disorders in general had adopted the nomenclature of the 1980 third edition of the DSM (DSM–III); however, the DSM had been revised in 1987 (generally referred to as DSM–III–R, the third edition, revised) and again in 1994 (DSM IV, the fourth edition). On October 8, 1996, VA issued a final rule amending that portion of its Schedule for Rating Disabilities pertaining to mental disorders. 61 Fed.Reg. 52,695 (Oct. 8, 1996); *see also* 60 Fed.Reg. 54,826 (Oct. 26, 1995). The revised regulations took effect on November 7, 1996, and, hence, are in effect on the date this opinion is issued. This new final rule makes no change in the specific § 3.304(f) PTSD regulation, but revised 38 C.F.R. § 4.125 and § 4.126 and replaced § 4.130 with a new section that specifically adopts DSM–IV as the basis for the nomenclature of the rating schedule for mental disorders. 61 Fed.Reg. 52,700 (Nov.1996 amendments) [hereinafter (Nov 96 amnds)].

Despite this reference to DSM–IV in the recently revised VA general mental disability C.F.R. regulations now in effect, the Manual M21–1 PTSD provisions still specifically refer to the DSM–III–R. *See* MANUAL M21–1, Part VI, ¶ 7.46(a) (1995) (setting forth detailed "diagnostic criteria as required by DSM–III–R" as to PTSD); *see also* MANUAL M21–1, Subch. XII, ¶ 50.45(b)(1) (1989) (same PTSD criteria as DSM–III–R). As discussed above, to the extent that the Manual M21–1 provisions are more favorable to the claimant than the C.F.R. regulatory provisions, they are for application; to the extent that the Manual M21–1 contains added requirements that are more restrictive than the applicable PTSD C.F.R. regulation, they cannot be applied in a manner adverse to the veteran. *See Hayes, Austin, Karnas*, and *Fugere*, all *supra*. However, as to the DSM diagnostic criteria, the Court concludes that they—whether DSM–III, DSM–III–R, or DSM–IV— do not run afoul of the *Hayes/Austin/Karnas/Fugere* proscriptions because they were adopted generally as to mental disability by cross reference in the C.F.R. However, because regulation 3.304(f) is specific as to PTSD and the DSM incorporation provision in the C.F.R. is generalized as to mental disorders, we conclude that the

DSM criteria cannot be read in a manner that would add requirements over and above the three primary elements set forth in § 3.304(f) as to PTSD service-connection claims. Accordingly, the DSM criteria acquire an auxiliary role, as described below.

In order to give appropriate primacy to the express § 3.304(f) PTSD provision that requires a "clear diagnosis" of PTSD and does not specifically set forth any requirements regarding the sufficiency of a stressor and the adequacy of symptomatology to support a PTSD diagnosis such as those contained in the DSM, and without also requiring that a claimant produce evidence meeting the more stringent DSM criteria requiring such stressor sufficiency and symptomatology adequacy, a clear (that is, unequivocal) PTSD diagnosis by a mental-health professional must be presumed (unless evidence shows to the contrary) to have been made in accordance with the applicable DSM criteria as to both the adequacy of the symptomatology and the sufficiency of the stressor. Mental health professionals are experts and are presumed to know the DSM requirements applicable to their practice and to have taken them into account in providing a PTSD diagnosis. Only when there is, as there was in this case, a medical opinion as to the first (an unequivocal, current PTSD diagnosis) and third (nexus of current symptomatology to claimed in-service stressor) § 3.304(f) PTSD elements do the DSM criteria come directly into play for purposes of VA/BVA adjudication. At that point, the applicable DSM criteria (as to the symptomatology or stressor requisites) may be used by the Board, but only as the basis for a return of the examination report to the RO for clarification or further examination; such return is mandated when the Board believes that that report does not accord with the applicable DSM diagnostic criteria. *See* 38 C.F.R. § 4.125 (Nov 96 amnds) ("[i]f the diagnosis of a mental disorder does not conform to DSM–IV or is not supported by the findings on the examination report, the rating agency *shall* return the report to the examiner to substantiate the diagnosis" (emphasis added)); 38 C.F.R. § 4.126 (1996) ("[i]f a diagnosis is not supported by the findings shown on the examination report, it is *incumbent* upon the

[rating] board to return the report for clarification" (emphasis added)); MANUAL M21–1, part VI, ¶ 7.46(e) (1995) ("[i]f an examination is received with the diagnosis of PTSD which does not contain the above essentials of diagnosis, *return* the examination as incomplete for rating purposes, note the deficiencies, and request reexamination" (emphasis added)); MANUAL M21–1, Subch. XII, ¶ 50.45(c) (1989) (essentially same as Manual M21–1, ¶ 7.46(e) (1995), provision quoted in above parenthetical); VA Gen. Coun. Prec. 10–95, ¶ 1 (Mar. 31, 1995) [hereinafter G.C. Prec. 10–95] ("[i]f the diagnosis is not in accordance with the manual [DSM], it 'is not acceptable for rating purposes' and *must* be returned to the examiner") (emphasis added); *see also* 38 C.F.R. §§ 4.2, 19.9 (1996); *cf. Massey v. Brown*, 7 Vet.App. 204, 208 (1994) (Board consideration of factors wholly outside rating criteria is legal error).

For example, if the discussion of the stressor in the examination report does not fit within the description of a PTSD stressor under the applicable DSM, that would provide a basis for the BVA to return the examination report to the RO for clarification as to how there can be a clear diagnosis of PTSD, as required by § 3.304(f), in light of the DSM requirements. *See ibid.* The Board cannot use the DSM provisions themselves as a basis for rejecting the veteran's favorable medical evidence as to the sufficiency of a stressor or the adequacy of the veteran's symptomatology (but rather must rely on independent medical evidence) even if the clarification sought is not provided by the original examiner. *See Hayes, Austin, Karnas,* and *Fugere,* all *supra.* As is explained more fully below, if, upon such a return by the BVA, the original examiner does not provide clarification in terms of the applicable DSM criteria, the Board would have the option of returning the examination report again, or seeking independent medical evidence as to the PTSD diagnosis of the veteran. (Nothing in 38 C.F.R. § 4.126 would restrict development of independent evidence concurrent with or after seeking clarification.)

The DSM–III–R PTSD criteria incorporated by the Manual M21–1 at the time VA

adjudication of this case began state that an essential feature of a diagnosis of PTSD is the development of characteristic symptoms following an "event that is outside the range of usual human experience and that would be markedly distressing to almost anyone, e.g., serious threat to one's life or physical integrity; ... or seeing another person seriously injured or killed as the result of an accident or physical violence." DSM–III–R at 247–48; *Zarycki*, 6 Vet.App. at 99. However, the diagnostic criteria for a stressor now in effect for VA adjudication under DSM–IV differ substantially from those in DSM–III–R. Under DSM–IV, there is no longer the requirement that the stressor be "outside the range of usual human experience" and be "markedly distressing to almost anyone". DSM–III–R at 247–48; *see* DSM–IV at 427–28; G.C. Prec. 10–95, ¶ 7 ("[T]he criteria for [PTSD] have been significantly revised in DSM–IV. The DSM–III requirement that the psychologically traumatic event or stressor be one 'that would evoke significant symptoms of distress in almost everyone' has been deleted, and DSM–IV instead requires that the person's response to the stressor involve intense fear, helplessness, or horror."). The DSM–IV provides two requirements as to the sufficiency of a stressor: (1) A person must have been "exposed to a traumatic event" in which "the person experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others" and (2) "the person's response [must have] involved intense fear, helplessness, or horror". DSM–IV at 427–28. These criteria are no longer based solely on usual experience and response but are individualized (geared to the specific individual's actual experience and response).

Hence, under the DSM–IV, the mental illness of PTSD would be treated the same as a physical illness for purposes of VA disability compensation in terms of a predisposition toward development of that condition. For example, VA does not deny a service-connection award to a veteran whose lack of good balance causes him to fall and be injured during service even though a service person with better balance would not have been injured at all. This is analogous to the well-established principle of tort law that a tortfeasor "takes the plaintiff as he finds him." *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 907–08 (2d Cir.1993) (quoting *Maurer v. United States*, 668 F.2d 98, 100 (2d Cir.1981) (per curiam), and citing RESTATEMENT (SECOND) OF TORTS § 435, at 454 (1965) and W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 43, at 292 (5th ed.1984)); *see Maurer*, 668 F.2d at 99–100 ("It is a settled principle of tort law that when a defendant's wrongful act causes injury, he is fully liable for the resulting damage even though the injured plaintiff had a preexisting condition that made the consequences of the wrongful act more severe than they would have been for a normal victim."); *see also Stevens v. Bangor and Aroostook R.R.*, 97 F.3d 594, 602 n. 8 (1st Cir.1996) (noting that Federal Employers' Liability Act and other federal statutes incorporate the "eggshell skull" rule to prevent defendants from avoiding liability in certain cases); *Testa v. Village of Mundelein, Ill.*, 89 F.3d 443, 446 (7th Cir.1996) (applying Illinois law that allows tortfeasor liability for injuries he or she caused, even though injuries are aggravation of preexisting medical condition that would make plaintiff more susceptible to injury from defendant's conduct). This "eggshell plaintiff rule" has generally been applied to cases in which the cause and effect of an injury are physical but also has been applied "[w]hen an emotional injury causes physical manifestations of distress". *Pierce v. S. Pacific Transp. Co.*, 823 F.2d 1366, 1372 n. 2 (9th Cir.1987); *cf. Testa*, 89 F.3d at 446–47 (implying that rule could be applied in case where competent medical evidence showed that plaintiff's preexisting mental state made him "more susceptible to [psychological] injury from the defendant's conduct").

Relating to stressors, the DSM–IV provides examples of traumatic events that are experienced directly, such as military combat, and those that are witnessed. (DSM–III–R had provided that "[s]tressors producing this disorder include ... deliberately caused disasters (e.g., bombing, torture, death camps)." DSM–III–R at 248.) The

Manual M21–1 also provides the following guidance that may be applied in a manner favorable to the veteran: "A stressor is not to be limited to just one single episode. A group of experiences also may affect an individual, leading to a diagnosis of PTSD." MANUAL M21–1, Part VI, ¶ 7.46(b)(2) (1995); MANUAL M21–1, Subch. XII, ¶ 50.45(f)(2) (1989); *see Hayes, Austin, Karnas,* and *Fugere,* all *supra.*

In view of the subjective nature of the DSM–IV criteria for assessing the sufficiency of a PTSD stressor, the question of the sufficiency of the asserted stressors, in terms of DSM–IV's two requirements, is a medical question requiring examination and assessment of the veteran by a mental-health professional. *See West (Carleton) v. Brown,* 7 Vet.App. 70, 79 (1994) (noting that "a significant diagnostic feature of PTSD requires that the sufficiency of the stressor be *clinically* established"). Hence, the Board can reject favorable medical evidence as to stressor sufficiency only on the basis of independent medical evidence, accompanied by an adequate statement of reasons or bases, and only after first seeking clarification of an incomplete examination report (whether or not such clarification is actually provided by the original examiner) pursuant to applicable VA regulatory provisions discussed above. *See Colvin v. Derwinski,* 1 Vet.App. 171, 174 (1991); *see also* 38 U.S.C. § 7104(d)(1); *Caluza, supra; Gabrielson v. Brown,* 7 Vet. App. 36, 39–40 (1994); *Gilbert v. Derwinski,* 1 Vet.App. 49, 57 (1990).

In *Zarycki,* the Court held that it is the distressing event, rather than the mere presence in a "combat zone", that may constitute a valid stressor for purposes of supporting a diagnosis of PTSD. *Zarycki,* 6 Vet.App. at 99; *cf. Swann v. Brown,* 5 Vet.App. 229, 233 (1993) (holding that "[a]ppellant's account of two mortar attacks ... and of a Viet Cong corpse hanging in the tree, even if true, do not portray situations where appellant was exposed to more than an ordinary stressful environment, *particularly where there is no evidence that the mortar attacks' impact areas were close to appellant* or resulted in any casualties" (emphasis added)). In *Swann,* the Court rejected doctors' diagnoses

of PTSD, made almost 20 years after the appellant's separation from service, because there were discrepancies in the appellant's narratives as to whether he was caught in mortar fire "numerous" times or on only two occasions. *Id.* at 233. Additionally, the Manual M21–1 provisions applicable to the PTSD claim before the Court in that case included, as part of the diagnostic criteria, the requirement of, for non-combat-related stressors, corroboration of a "stressor of sufficient gravity to evoke the symptoms in almost anyone". *Id.* at 232 (quoting MANUAL M21–1, Part VI, ¶ 7.46(f) (Sept. 21, 1992)). Because under the new DSM–IV PTSD diagnostic criteria, as noted above, this test ("almost anyone") is no longer applicable, these two cases would not apply to the consideration of the DSM–IV criteria.

**b. Occurrence of in-service stressors:** As to the second PTSD-service-connection element (occurrence of in-service stressors), § 3.304(f) requires "credible supporting evidence that the claimed in[-]service stressor actually occurred". It is clear that the required corroboration of the occurrence of in-service stressors need not be found only in service records, as the Manual M21–1 had required before the adoption of § 3.304(f) (*see, e.g.,* MANUAL M21–1, Part VI, ¶ 7.46(f) (Sept. 21, 1992); MANUAL M21–1, Subch. XII, ¶ 50.45(d) (1989); *see also Hayes,* 5 Vet.App. at 67) "but may be obtained from other sources". MANUAL M21–1, Part VI, ¶ 7.46.c (1995); *see Moreau,* 9 Vet.App. at 394–95; *Doran v. Brown,* 6 Vet.App. 283, 289 (1994). If the claimed stressor is not combat related, a veteran's lay testimony regarding in-service stressors is insufficient to establish the occurrence of the stressor and must be corroborated by "credible supporting evidence". *Moreau,* 9 Vet.App. at 395; *Doran, supra; see also Moreau,* 9 Vet.App. at 395–96 (interpreting § 3.304(f) as precluding use of medical opinion based on post-service examination of veteran as credible evidence to help establish "actual" occurrence of in-service stressor).

Although the Secretary concedes that certain M21–1 provisions adopted after the BVA decision here on appeal apply to the present appeal because they contain "a liberalizing

provision in that [they] no longer restricted corroborating evidence to service department records" (Brief (Br.) at 14; *see Hayes, supra* (quoting *Karnas, supra*)), the 1995 Manual M21–1 provision actually does no more than mirror the regulation itself, which does not limit the source of the required "credible supporting evidence".

***c. Causal nexus:*** As to the third element necessary for awarding service connection for PTSD (causal nexus between current symptomatology and the claimed in-service stressor), the Manual M21–1 does not appear to contain any additional requirements as to the third element as compared to the content of section 3.304(f), let alone any additional requirements that are more favorable to the veteran. *See* MANUAL M21–1, Part VI, ¶ 7.46(f) (1995); *see also* MANUAL M21–1, Subch. XII, ¶ 50.45 (1989); *Hayes, Austin, Karnas,* and *Fugere,* all *supra.* The DSM–IV provisions do not directly address this element.

***2. Application to facts of case.*** The regulatory provisions as elucidated above apply to the circumstances of the instant case in the following ways.

 ***a. Current medical diagnosis:*** The Board concluded that "the diagnos[e]s of PTSD set forth by the veteran's private physician and on the one VA examination simply cannot be supported by the evidence". R. at 13–14. The BVA determined that there was no corroborative evidence of in-service stressors that the Board accepted as sufficient to cause PTSD and thus discounted the medical diagnoses of PTSD. R. at 12–14. As to the sufficiency of the claimed stressor, the Board found that "the stressful events described by the veteran concern primarily his viewing, after the fact, of damage at the DWP and landing in an area which was under fire; the remaining events described do not rise to the level of a stressor as defined in DSM–III". R. at 8–9. The Board then stated that because "rocket and mortar attacks were common", they could not "serve as a sufficient stressor to evoke PTSD". *Ibid.*

 The Board is required by 38 U.S.C. § 7104(d)(1) to provide an adequate statement of reasons or bases for its findings, including a clear analysis of the evidence that it finds persuasive or unpersuasive with respect to that issue, and to provide the reasons for its rejection of any material evidence favorable to the veteran. *See Caluza,* 7 Vet. App. at 506; *Gabrielson,* 7 Vet.App. at 39–40; *Gilbert,* 1 Vet.App. at 57. As to the Board's summary rejection of the diagnoses of PTSD appearing in the three medical reports in this case, the Board failed to discuss each medical report and give an adequate statement of reasons or bases under 38 U.S.C. § 7104(d)(1) for accepting or rejecting each one. However, the BVA decision contains another defect, discussed below, that supersedes the reason-or-bases error with respect to the PTSD diagnoses.

 Because it is clear that the Board doubted the adequacy of the PTSD diagnoses in this case, specifically, the sufficiency of the claimed stressors, the Board was required to comply with the return-for-clarification requirement in applicable VA regulatory provisions discussed in part II.B.1.a., above. The Board is not free to disregard VA regulations. *See Sutton v. Brown,* 9 Vet.App. 553, 568–69 (1996) (citing *Morton v. Ruiz,* 415 U.S. 199, 232, 94 S.Ct. 1055, 1073, 39 L.Ed.2d 270 (1974), *Vitarelli v. Seaton,* 359 U.S. 535, 538, 539–40, 79 S.Ct. 968, 971–72, 972–73, 3 L.Ed.2d 1012 (1959), and *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957)).

In any event, because the sufficiency of the stressors to support a PTSD diagnosis and the adequacy of the veteran's symptomatology are medical questions, the Board was not free to reject uncontradicted, unequivocal medical diagnoses of record—by Dr. Singh, Dr. Robinson, or Mr. Young—that are presumed to have found the veteran's stressors and symptoms to be sufficient to support the PTSD diagnosis and in this case did specifically find the veteran's war-experience stressors sufficient to warrant a PTSD diagnosis, without first returning the reports to the original examiner(s) for clarification in accordance with applicable VA regulatory provisions discussed in part II.B.1.a., above, and then relying on independent medical evidence providing a basis for any such rejec-

tion. *See West* and *Colvin,* both *supra; Wilkinson v. Brown,* 8 Vet.App. 263, 271 (1995).

In addition, the Court notes that in this case, because the veteran's PTSD claim was well grounded, if the Board was in doubt as to the sufficiency of the veteran's medical evidence, as it clearly was here, then fulfillment of the statutory duty to assist under section 5107(a) would require that VA provide a comprehensive, current examination in accordance with the applicable DSM criteria; the Board could not just deny the claim without providing such assistance. *See Allday v. Brown,* 7 Vet.App. 517, 526 (1995) (citing *Suttmann v. Brown,* 5 Vet.App. 127, 138 (1993) and *Green (Victor) v. Derwinski,* 1 Vet.App. 121, 124 (1991) (duty to assist may include "the conduct of a thorough and contemporaneous medical examination, one which takes into account the records of prior medical treatment, so that the evaluation of the claimed disability will be a fully informed one")).

In view of the foregoing, the Court holds, on this record, that the undisputed, unequivocal diagnoses of PTSD by the three mental-health professionals establish the current disability as a matter of law. As a result, the asserted stressors in this case in terms of the veteran's experiences in the war are, as a general matter, presumed—and here have actually been found by three mental-health professionals as shown by their current diagnosis of PTSD—to be sufficient to cause PTSD in the veteran. Because there are undisputed, unequivocal current diagnoses of PTSD and the Board did not make a finding that the reports were incomplete under the applicable DSM and then follow the regulation by returning them for clarification, the sufficiency of the stressor, as a component of a diagnosis of PTSD, was established as a matter of law in this case. Hence, a remand for the Board to consider, as to the stressors, the applicability of the newly adopted DSM–IV criteria, which are geared to the specific individual's actual experience and response and not to an uncommon experience or an unusual experience, is not warranted in this case. Accordingly, the Court will reverse the BVA decision in this respect.

Moreover, as to the adequacy of the symptomatology and sufficiency of the claimed stressor to support a PTSD diagnosis, the Court notes, although it is not necessary to its decision here, that the three medical diagnoses are replete with descriptions of symptomatology that appears consistent with the criteria in the DSM. The February 1990 VA medical examination report by VA psychiatrist Dr. Singh recorded the veteran's complaints of, inter alia, nightmares, panic attacks, flashbacks, and problems with anger; reviewed Dr. Robinson's report, the social survey, and the claims file; and stated: "The [veteran] stated that he had seizure or violent attacks while he was in Vietnam itself[;] however[,] most of the symptoms started in 1980.... [He] went through several traumatic incidents. [He] says he gets blackout spells and goes into rage." R. at 129. Other traumatic events recorded by Dr. Singh included sniper fire, inability to help a Vietnamese friend in danger, mortars and rockets having hit the veteran's unit several times, and rocket fire while on guard duty, and Dr. Singh's report referred to the social survey for further details. *Ibid.* Dr. Singh noted that the veteran was on medication to control his rage attacks and diagnosed him with PTSD, "chronic, delayed type." R. at 130. Dr. Robinson and Mr. Young also reported specifically the following as to the veteran's experiences in Vietnam: His response to the events; his reexperiencing of the events; his inability to recall certain aspects of the events; feelings of estrangement; and persistent symptoms of difficulty with sleep, controlling his anger, and concentration; and gave their diagnoses of PTSD. R. at 98–101, 126–28, 215–16. They also noted the veteran's feelings of being in great danger due to his unit being subjected to constant daily mortar and rocket attacks. R. at 98, 127, 216. *See* DSM–III, DSM–III–R, and DSM–IV. In addition, the veteran's response to these events appears to involve "intense fear, helplessness, or horror". DSM–IV at 428. Dr. Robinson's medical reports noted the veteran's "horrifying feelings and symptoms since his Vietnam experience" (R. at 99), his feelings of being "completely helpless" (*ibid.*) and having a "sense of hopelessness" (R. at 100), and his being

"constantly afraid of losing control of his reactions" (R. at 216). Mr. Young stated that the veteran was "intensely frustrated over the harassing mortar fire and his inability to retaliate". R. at 127.

**b. Occurrence of in-service stressors:** The Court notes in this regard that, although a clear PTSD diagnosis (which necessarily presumes the sufficiency of stressors to cause the PTSD) is established in this case, that does not end the inquiry because that diagnosis satisfies only one element required in order for service connection for PTSD to be awarded. There must also be evidence establishing the **occurrence** of the stressor (the type of evidence that is required depends on whether the alleged stressor is related to combat) and medical evidence to link the stressor to the current symptomatology. *See* parts II.B.2.b.(i) and (ii) and 2.c., below. An opinion by a mental health professional based on a postservice examination of the veteran cannot be used to establish the occurrence of the stressor. *See Moreau*, 9 Vet.App. at 395–96. As discussed below, the Board has already accepted the corroborative statement of the veteran's comrade as to the exposure to frequent mortar and rocket attacks, so the occurrence of that stressor has been established; as to the occurrence of the asserted stressor upon the veteran's landing at Da Nang, or of any other stressor, if the Board finds that the veteran was engaged in combat with the enemy, that is a matter that may need to be addressed on remand. *See* parts II.B.2.b.(i) and (ii), below.

**(i) Combat:** The Board found that the evidence did not "show that [the veteran] had a combat [MOS] or that he was assigned to a unit which was involved in combat operations". R. at 8. These were the only findings made by the Board with respect to whether the veteran had engaged in combat with the enemy. The appellant asserts that the Board failed to provide an adequate statement of reasons or bases for rejecting his testimony that "although his MOS had been power generator equipment mechanic, he had never performed that duty while he was in Vietnam" and that instead he had been assigned, among other duties, to work on convoys and to perform guard duty. Br. at 17. The appellant contends that his experiences with mortar and rocket attacks and sniper fire are entirely consistent with the type of duty, i.e., guard and convoy, that he performed in Vietnam and that his testimony supports a finding that his stressors were related to combat.

In this case, the Board failed to make a finding as to the credibility of the veteran's sworn testimony describing his duties while in Vietnam, *see Lizaso v. Brown*, 5 Vet.App. 380, 386 (1993); *Ohland v. Derwinski*, 1 Vet.App. 147, 149–50 (1991); *Hatlestad v. Derwinski*, 1 Vet.App. 164, 169, 170 (1991), and the Board failed to articulate clearly whether it found the veteran to have engaged in combat. In order for this Court to be able to carry out effective review of a BVA denial of a PTSD service-connection claim, the Board must generally make specific findings of fact, supported by an adequate statement of reasons or bases under section 7104(d)(1), as to whether or not the veteran was engaged in combat with the enemy, and, if so, whether the claimed stressor was related to such combat. *See Zarycki*, 6 Vet.App. at 98; *see also Caluza, Gabrielson,* and *Gilbert,* all *supra.* Because of the Board decision's lack of an express finding with respect to combat, the reduced evidentiary threshold for combat veterans under section 1154(b), the veteran's contention that the claimed stressors were related to combat, and the corroborative statement of his comrade about "combat" experiences, the Court holds that the Board's failure in this regard cannot be considered nonprejudicial error. *See* 38 U.S.C. § 7261(b) (requiring Court to take due account of rule of prejudicial error); *cf. Doran, supra* (holding that Board's failure to make preliminary finding as to whether veteran was engaged in combat with enemy and whether his stressors were related to combat was harmless error under section 7261(b) where veteran had not contended that claimed stressors were related to combat and there was no indication in record that his alleged stressors were so related).

In this regard, the Court finds a significant deficiency in 38 C.F.R. § 3.304(f) and the Manual M21–1 in that they do not adequately

reflect, for the purpose of establishing in-service stressors, the relaxed adjudicative evidentiary requirements provided by section 1154(b) for establishing service incurrence of an event. Although the regulation and the Manual M21–1 provision state that proof of an in-service stressor that is claimed to be related to combat may be shown by service department evidence that the veteran engaged in combat, or that the veteran received a particular decoration or award, they do not *expressly* provide that a combat veteran's lay testimony alone may establish an in-service stressor pursuant to section 1154(b). This Court has held that, under 38 U.S.C. § 1154(b), 38 C.F.R. § 3.304, and the Manual M21–1 provisions then applicable, where it is determined that the veteran was engaged in combat with the enemy and the claimed stressors are related to such combat, the veteran's lay testimony regarding claimed stressors must be accepted as conclusive as to their occurrence and that no further development for corroborative evidence will be required, provided that the veteran's testimony is found to be "satisfactory" and "consistent with the circumstances, conditions, or hardships of such service", 38 U.S.C. § 1154(b). *Zarycki*, 6 Vet.App. at 98; *see also Caluza, supra;* 57 Fed.Reg. 34,536 (proposed rule for what became § 3.304(f) (Aug. 5, 1992)) (noting in the supplementary information: "The chaotic circumstances of combat, however, preclude the maintenance of detailed records. Consequently, the Secretary has determined that when service department records indicate that the veteran engaged in combat or was awarded a combat citation and the claimed stressor is related to the combat experience, *further development to document the occurrence of the claimed stressor i[s] unnecessary*" (emphasis added)); 58 Fed.Reg. 29,109 (final rule May 19, 1993) (noting in the supplementary information that § 3.304(f) is "fully consistent" with "the provisions of 38 U.S.C. § 1154(b)"). This specific application of section 1154(b) is a significant omission from the VA regulations governing PTSD cases, and that omission needs to be corrected by the Secretary. *See Zang v. Brown*, 8 Vet.App. 246, 255–56 (1995) (Steinberg, J., separate views).

■ Of course, section 1154(b) does not require the acceptance of a veteran's assertion that he was engaged in combat with the enemy; it would be tautological to conclude that it did. *See Irby v. Brown*, 6 Vet.App. 132, 136 (1994) (section 1154(b) cannot be applied to appellant's PTSD claim until BVA first finds that appellant has engaged in combat). The determination of combat status is a question to be decided on the basis of the evidence of record in each case. *See West*, 7 Vet.App. at 76 (whether veteran was engaged in combat with enemy is determined through receipt of certain recognized military citations or other supportive evidence); 57 Fed. Reg. 34,536.

Thus, in this case, if the veteran was engaged in combat in connection with any of the asserted stressors that might be construed as combat related (that is, mortar fire while on convoys and guard duty, or being fired on when returning from R & R), then, under section 1154(b), his lay evidence as to stressors related to such combat must be accepted unless inconsistent with the circumstances, conditions, or hardships of service or unless the BVA finds by clear and convincing evidence that a particular asserted stressful event did not occur (the Board has already accepted his comrade's lay testimony as to the mortar and rocket attacks, *see* part II. B.2.b.(ii)(1), below). *See Caluza*, 7 Vet.App. at 508–09; *see also Collette*, 82 F.3d at 393 (VA may rebut section 1154(b) presumption by clear and convincing evidence to the contrary). Accordingly, the Court will remand to the Board for it to determine whether the veteran was ever engaged in combat. If the Board determines that he was so engaged, then, as to the alleged stressors (other than the corroborated frequent mortar and rocket attacks), it should apply the provisions of sections 1154(b) and 3.304(b) and (to the extent more favorable to the veteran in this case) of the Manual M21–1 to determine if any asserted stressors were combat related.

■ *(ii) Noncombat:* As discussed in part II.B.2.b.(i), above, if the veteran did engage in combat with the enemy, he is entitled to have his lay statements accepted, without the need for further corroboration, as satisfactory evidence that the claimed

events occurred, unless his descriptions are not consistent with the circumstances, conditions, or hardships of service or unless the BVA finds by clear and convincing evidence that a particular asserted stressful event (other than the corroborated, frequent mortar and rocket attacks) did not occur. If, however, it is determined that the veteran did not engage in combat, credible supporting evidence from any source showing that his claimed in-service stressors actually occurred would be required for him to prevail. *See* 38 C.F.R. § 3.304(f); *Moreau,* 9 Vet.App. at 394–95 *Doran,* 6 Vet.App. at 290. Under such circumstances, the veteran's lay testimony regarding the stressors would thus be insufficient, standing alone, to establish service connection. *See Moreau,* 9 Vet.App. at 395; *Doran, supra.*

In addition to his assertions regarding his involvement in combat, described above, the appellant alleges that the following stressors occurred during his service: (1) Being subjected to repeated mortar and rocket attacks, including the DWP event and being on a plane that had to land during an attack; (2) viewing, treating, or dealing with casualties; (3) participation in convoys; (4) many hours of work and lack of sleep; and (5) witnessing a young Vietnamese boy, whom he had befriended, being taken away by military police. R. at 82, 83–84, 183–87, 224–37.

In rejecting the alleged DWP stressor, the Board found that the veteran's account of the aftermath of the attack on the DWP was refuted by official records that reflected no personnel casualties. R. at 12–13. As to the attack while the veteran was landing at Da Nang upon returning from R & R [hereinafter "landing stressor"] and other attacks and incidents, the Board concluded:

> The veteran has also described being under attack when he returned from R & R in Australia. He did not originally describe this event when he set forth his stressors in the August 1989 statement. At that time, he reported his unit was only involved in one firefight. Subsequently he has made vague references to being involved in firefights, mortar attacks, and rocket attacks. The anecdotal incident involving feeling as if he were dead is not subject to verification. Moreover, the incidents regarding his friendship with the Vietnamese boy do not reflect the presence of any particular stressor.
>
> The veteran has reported that he only once fired his weapon into an area around his unit. His descriptions of other stressful incidents vary greatly and he does not cite any particular incident with sufficient specificity to permit authentication. While he reports that there were rocket and mortar attacks, he has given varying accounts of the frequency and intensity of these events. ***The lay statement submitted by an individual who served with him confirms that rocket and mortar attacks occurred several times per week;*** he does not describe any specific incidents which could serve as stressors.... As noted by ESG, rocket and mortar attacks were common; there has been no confirmation of any specific incident which would serve as a sufficient stressor to evoke PTSD.
>
> With regard to the veteran's allegation that he was ordered to attend funerals, alternatively reported as in Washington, D.C., and in Pennsylvania, there is no confirmation. His personnel records show that he left Vietnam at the end of June 1969 and that he was assigned to a unit in Pennsylvania from mid August 1969 until his discharge in September 1969. Moreover, such activity would not have constituted a sufficient stressor, pursuant to the definition above [referring to definition provided in DSM–III–R and/or in *Zarycki* ], particularly in light of the short period of time involved.

R. at 13 (emphasis added).

■ *(1) Mortar and rocket attacks:* In this case, the Board found that the lay statement by the veteran's comrade, provided as corroborative evidence, "confirms that rocket and mortar attacks occurred several times per week" but that he "does not describe any specific incidents which could serve as stressors." R. at 13. The Board thus found that frequent mortar and rocket attacks were corroborated by the comrade statement but that exposure to frequent mortar and rocket attacks cannot serve as a stressor sufficient to cause PTSD. *Ibid.* (The question whether a

stressor is sufficient to support a PTSD diagnosis is discussed in parts II.B.1.a. and 2.a., above.)

The evidence shows that the veteran described what to him were distressing events, specifically, being exposed to rocket and mortar attacks while on guard and convoy duty and frequently while with his unit. The Board accepted the comrade's evidence that corroborates the veteran's testimony that there were frequent mortar attacks close to him. The veteran here, unlike the veteran in *Swann,* has consistently asserted and testified that he was subjected to constant mortar and rocket attacks—in his August 1989 statement (R. at 82–83), in the history he provided to Dr. Robinson in July 1989 (R. at 98), in the history he provided to Mr. Young in January 1990 (R. at 126–27), in the history he provided to Dr. Singh in February 1990 (R. at 129), and in his sworn testimony before the RO and before the Board (R. at 183, 185–86, 224, 226, 228)—and that they sometimes were "close" (R. at 83, 98, 224). His comrade, Mr. Remsnyder, stated that he had served with the veteran in Vietnam, that their unit had received rocket and mortar attacks approximately 3 to 4 times per week, and that those attacks were close. R. at 195. In addition, the ESG report provided some corroboration as to rocket and mortar attacks. R. at 150–51. Accordingly, the Board correctly found corroboration of this stressor, and thus the second requisite element for service connection ("credible supporting evidence that the claimed inservice stressor actually occurred") has been established on this record. *See* 38 C.F.R. § 3.304(f).

*(2) Attack upon landing:* The following analysis with respect to remand actions regarding the asserted landing stressor obtains only if the Board does not award PTSD service connection based on the mortar-and-rocket-attack stressor. As to the asserted landing stressor, if the Board finds that the veteran was engaged in combat at that point, then it must proceed as outlined in part II.B.2.b.(i), above, with regard to the assessment of that asserted stressor. If not, however, then there is still a duty-to-assist problem regarding this matter. Because the veteran's claim for PTSD service connection

was well grounded (*see* part II.A., above), the Board was required to assist him under 38 U.S.C. § 5107(a) in developing the facts pertinent to his claim. *See Murphy, supra; see also Grottveit,* 5 Vet.App. at 93. Although the ESG reported that it was unable to document all of the information supplied by the veteran as to his experiences in Vietnam, it was able to verify some information—specifically, that the DWP attack took place and in general that it was "uncommon for a veteran to have served in Vietnam without having been rocketed or mortared during the time he served there". R. at 150. Additionally, the ESG informed VA that it required more information from the veteran in order to investigate further his claimed experiences in service. *Ibid.* Specifically, the ESG report stated: "In order to conduct meaningful research, the veteran must provide the 'who, what, where[,] and when' of each stressor." R. at 151.

The only evidence in the record even suggesting that VA requested such further information from the veteran is a notation in the October 1990 RO decision that "[b]ased on the vagueness of information submitted by the veteran ... the supporting evidence needed to establish a diagnosis of PTSD due to in[-]service stressor is not of record" (R. at 158) and a statement in a corresponding cover letter that the veteran "may submit evidence at any time showing the disability exists and was incurred in or aggravated by service or was treated within one year after service" (R. at 161). Prior to the ESG report, the RO did request a full description of all stressors the veteran was claiming had caused his condition, including names, places, and times of all events (R. at 67); the veteran responded, yet the RO's indirect suggestions noted above did not inform him that the ESG had reported finding that the information he had provided was insufficient.

Based on the foregoing, the Court holds that VA did not fully carry out its duty to assist, under section 5107(a) and the Manual M21-1, with respect to verification of the veteran's claimed landing stressor. *See Zarycki,* 6 Vet.App. at 99–100 (holding that, as part of duty to assist, VA is required to inform veteran of additional information

sought by ESG); MANUAL M21–1, Part VI, ¶ 7.46(g)(5) (1995) ("[i]f the ESG . . . requests a more specific description of the stressor in question, immediately request the veteran to provide the necessary information"). Although the April 16, 1990, VA letter to the ESG, requesting verification of stressors and attaching the report from Mr. Young, included a reference to this incident, the veteran's subsequent testimony in April 1991 revealed further significant details of the event—specific date(s) on which the incident may have occurred (May 20, 23, or 30) and the identification of the Da Nang air base, rather than a more general statement that Da Nang was the area under attack upon his return. R. at 183–84. Yet no further request based on this information was made to the ESG. In response to VA's April 1990 inquiry, the ESG had provided a report entitled "U.S. Naval Support Activity, Da Nang, Command History—1969", that included as section I, "Chronology of Events 1969". R. at 153–55. This section covered June 2 through June 15 (R. at 155) but did not cover May, which is when the veteran asserts the air base was under attack.

The Secretary's failure to afford the veteran the specific opportunity to respond to the ESG's request for additional information prevented VA from completing its statutory duty to assist him in developing his claim as to this stressor. Hence, on remand, this specific information and any other additional pertinent information provided should be included in a request to ESG for verification of this stressor, and any other further evidence obtained from the ESG should be provided to the veteran for response. *See Austin,* 6 Vet.App. at 551. Then, any new ESG information and rebuttal evidence and argument submitted by the claimant should be considered in the readjudication of this claim, and the Board's evaluation of that evidence and argument must be included, and supported by an adequate statement of reasons or bases, in the Board's decision. *See* 38 U.S.C. §§ 5107(a), 7104(d)(1).

*(3) Other asserted stressors:* If the Board finds that the veteran was engaged in combat at the time of any of the other asserted stressors, then it must proceed as outlined in part II.B.2.b.(i), above, with regard to the assessment of that asserted stressor. If not, then the following conclusions obtain. The Board's finding that the stressor involving the explosion at the DWP was "refuted by the official records of the incident, which reflect that there were no personnel casualties", was incomplete in that it failed to acknowledge the extent to which the report supported the veteran's testimony that the event took place. The Board also erred in stating that the veteran had been inconsistent as to whether he had seen fellow soldiers killed or wounded at the DWP. In fact, Dr. Robinson's report (R. at 98), the veteran's August 1989 letter to the RO (R. at 83), and the December 1989 Young report (R. at 127) all included as a stressor the veteran's allegation that his Navy friends had been killed at the DWP; he testified in April 1991 that he could not remember the names of friends who had been killed in the attack (R. at 187); and in March 1993 he testified that, although he couldn't "physically" see any of his friends who were killed, he "could see them through the gate" (R. at 228). However, the ESG report, by stating that there were no casualties from that attack, did repudiate the veteran's alleged stressor in terms of Navy friends being killed at the DWP. Accordingly, the Board's errors in assessing this stressor (assuming no finding of engagement in combat as to this asserted stressor) were not prejudicial to the veteran. *See* 38 U.S.C. § 7261(b); *Edenfield v. Brown,* 8 Vet.App. 384, 390–91 (1995) (en banc).

Again, assuming no pertinent finding of engagement in combat, the Court does not find error with respect to the Board's findings of a lack of confirmation of the other alleged stressors (relating to "funeral duty", witnessing casualties, a Vietnamese boy being taken away, and participation in convoys), nor does the Court hold that VA violated its duty to assist the veteran with respect to verifying these stressors. The ESG was unable to verify the veteran's allegations that he had been a guard, had participated in combat actions, or had handled casualties; and found that all his other asserted stressors (except for the attack on the DWP and the rocket and mortar attacks) were anecdotal incidents that it could not verify. R. at

150–52. The Court holds that there is a plausible basis in the record to support the Board's findings in these respects and thus concludes that (assuming no finding of engagement in combat as to these asserted stressors) there was no clear error requiring reversal as to these findings. *See* 38 U.S.C. § 7261(a)(4) ("in the case of a[BVA] finding of material fact . . ., [Court may] hold unlawful and set aside such finding if the finding is clearly erroneous"); *Gilbert*, 1 Vet.App. at 52–53.

 *c. Nexus evidence:* VA regulations require medical evidence of a causal nexus ("a link") between current symptomatology and the claimed in-service stressor in order for service connection for PTSD to be awarded. 38 C.F.R. § 3.304(f); *see Moreau*, 9 Vet.App. at 394–95. Although the Board in this case clearly rejected the diagnoses of PTSD in the three examination reports (discussed in part II.B.2.a., above), the Board did not make any specific findings as to whether the reports indicated "a link between current symptoms and an in[-]service stressful event(s)", pursuant to applicable regulations. Upon review of the evidence, the Court finds it unclear to what extent Dr. Robinson (private psychiatrist), Mr. Young (VA clinical social worker), and Dr. Singh (VA psychiatrist), in making their diagnoses of PTSD, relied on specific asserted stressors—the corroborated, frequent mortar and rocket attacks (or the asserted landing stressor)—as the source of the veteran's current symptoms (R. at 216). *See Colvin*, 1 Vet.App. at 174. The Court will thus remand to the Board the question whether the corroborated, frequent mortar attacks, the occurrence of which have been established on this record, contributed to the veteran's current symptoms of PTSD (that is, whether this claimed in-service stressor is linked to his current symptomatology, as required by 38 C.F.R. § 3.304(f)). If no such linkage is found, then the Board will address whether the asserted landing stressor, if it is found to have been connected to combat, or if not, if it is otherwise corroborated, contributed to the veteran's current PTSD symptoms.

The Court notes that, although a remand to the Board for compliance with applicable VA regulatory provisions regarding return of an incomplete report, as discussed in part II.B.1.a., above, is not required in this case as to the first PTSD-claim element (a clear diagnosis of PTSD (*see* part II.B.2.a.)), a remand is necessary with respect to the required element of linkage between current symptomatology and the claimed in-service stressor. This is because, first, the Board did not reach the nexus issue, and, second, the medical evidence of record is far less definitive and specific in terms of suggesting a connection between current symptomatology and a particular in-service stressor.

Accordingly, because the Board found that the comrade statement confirmed frequent rocket and mortar attacks and the Board did not return the reports because of incompleteness as to the diagnosis of PTSD, which includes the sufficiency of a stressor to support a PTSD diagnosis (as discussed in parts II.B.1.a., and 2.a., above), service connection must be awarded for PTSD unless the Board finds that none of the medical reports of record and supporting material is sufficient to put the evidence in equipoise as to the existence of "a link . . . between current symptomatology and the claimed in[-]service stressor" (38 C.F.R. § 3.304(f)), that is, as to whether the frequent mortar and rocket attacks were a specific basis (i.e., at least a contributory basis) for the current symptomatology identified in those reports. *See* 38 U.S.C. § 5107(b) (benefit of doubt applies to each material issue); *Gilbert*, 1 Vet.App. at 55–56 (benefit-of-the-doubt rule means evidence must preponderate against claim on material issues when claim is denied); 38 C.F.R. § 3.102 (1996); *cf.* 61 Fed.Reg. 52,-695, 52,698 (supplementary information explaining recently amended § 4.127 and stating that "[w]hen it is not possible to separate the effects of the conditions, VA regulations at 38 C.F.R. [§ ] 3.102, which require that reasonable doubt on any issue be resolved in the claimant's favor, clearly dictate that such signs and symptoms be attributed to the service-connected condition"). Upon reviewing the medical evidence of record, if the Board is in doubt on the contributory-basis question (the "link" requirement under § 3.304(f)), it must return the reports, pursuant to applicable VA regulatory provisions

discussed in part II.B.1.a., above, in connection with that question. If no clarification is then provided by the examiner, the Board can deny the claim based on an adequate statement of reasons or bases under 38 U.S.C. § 7104(d)(1) and relevant caselaw.

If the Board finds it necessary to address the asserted landing stressor (discussed in part II.B.2.b.(ii)(2), above), and then determines that this stressor occurred (that is, that it was part of combat or was corroborated), the same analysis applies as is set forth above regarding the rocket-and-mortar-attack stressor.

Moreover, as with the first requisite element of a PTSD-service-connection claim (a clear diagnosis), because the veteran's PTSD claim was well grounded, if the Board doubts the veteran's medical evidence regarding the third requisite PTSD-claim element, then fulfillment of the statutory duty to assist under section 5107(a) would require that VA seek a medical opinion on this nexus question. *See Allday, Suttmann*, and *Green*, all *supra*.

### C. Miscellaneous

██ Pursuant to its statutory duty to assist, "VA has a duty to assist in gathering social security records when put on notice that the veteran is receiving social security benefits". *Clarkson v. Brown*, 4 Vet.App. 565, 567–68 (1993); *see Murincsak v. Derwinski*, 2 Vet.App. 363 (1992) (pursuant to duty to assist, VA must seek to obtain all pertinent records, including Social Security Administration (SSA) records, of which it is put on notice); *Masors v. Derwinski*, 2 Vet. App. 181, 187–88 (1992); 38 C.F.R. § 3.159 (1996). In this case, the veteran gave sworn testimony at a March 1993 hearing before the Board that in 1989 he started receiving Social Security disability benefits because of his unemployability due to PTSD. R. at 247–48. The record before the Court does not include records from the SSA. On remand, pursuant to section 5107(a), the BVA must seek to obtain the SSA records, and, if obtained, consider them in its readjudication of the veteran's PTSD claim, and support its assessment of them with an adequate statement of reasons or bases. *See* 38 U.S.C. §§ 5107(a), 7104(d)(1).

### D. Benefit–of–the–Doubt Rule

██ The appellant contends that there was an approximate balance of positive and negative evidence presented on the issue of service connection and that he is thus entitled, under 38 U.S.C. § 5107(b), to have the benefit-of-the-doubt rule applied to his case. Br. at 21. The Secretary contends that this rule does not apply because the veteran's testimony is insufficiently corroborated and the Board is the factfinder as to the credibility of evidence.

As indicated above, according to the benefit-of-the-doubt rule in 38 U.S.C. § 5107(b), a VA claimant need have only an "approximate balance of positive and negative evidence in order to prevail". *Gilbert*, 1 Vet.App. at 54. Further, the reasons-or-bases requirement of 38 U.S.C. § 7104(d)(1) applies to the Board's application of the benefit-of-the-doubt rule. *See id.* at 58. Where "there is significant evidence in support of an appellant's claim, the Board must provide a satisfactory explanation as to why the evidence was not in equipoise." *Williams (Willie) v. Brown*, 4 Vet.App. 270, 273–74 (1993).

In its May 1994 decision, the Board found that the "preponderance of the evidence is against the veteran's claim" and did not specifically discuss the benefit-of-the-doubt rule. R. at 14. In this case, there is significant evidence in favor of the PTSD service-connection claim: His undisputed testimony that he had been assigned to guard and convoy duty (R. at 181–83, 223–24); his undisputed testimony that he had been exposed to frequent rocket and mortar attacks (R. at 183–86, 224, 226, 243), which was corroborated by his comrade (R. at 195) and generally corroborated by the ESG report (R. at 150–51); and undisputed diagnoses of PTSD by both VA and non-VA mental-health professionals (R. at 98, 100–101, 128, 130, 215–16) that relate his condition to stressors in Vietnam. There was no medical evidence that contradicted any of the medical evidence that was favorable to the veteran.

On remand, in evaluating the evidence for purposes of readjudication in accordance with this opinion, the Board must explain

carefully its conclusions as to the applicability of the benefit-of-the-doubt rule as to each material issue in the case, including the questions whether, according to medical evidence, the corroborated, frequent rocket-and-mortar-attack stressor was a contributing basis for the veteran's current PTSD symptoms; and, if not, whether the veteran served in combat; whether the asserted landing stressor is corroborated by any further ESG report or other evidence; and whether, according to the medical evidence, the landing stressor if found to have occurred was a contributory basis for the veteran's current PTSD symptoms. *See Williams, supra; Sheets v. Derwinski,* 2 Vet.App. 512, 516 (1992); *O'Hare v. Derwinski,* 1 Vet.App. 365, 367 (1991); *see also Fletcher v. Derwinski,* 1 Vet.App. 394, 397 (1991) ("[a] remand is meant to entail a critical examination of the justification of the decision" and is not "merely for the purposes of rewriting the opinion so it will superficially comply with the 'reasons or bases' requirement of 38 U.S.C. § 7104(d)(1)"). Also, because the Court holds that the undisputed diagnosis of PTSD by the three mental-health professionals established on the facts of this case, as a matter of law, a current PTSD disability, which necessarily includes the sufficiency of the alleged stressors (although not necessarily their occurrence), the changes brought about in the PTSD diagnostic criteria by VA's adoption, in 38 C.F.R. §§ 4.125 and 4.130 (Nov 96 amnds), of the DSM–IV nomenclature, effective on November 7, 1996 (61 Fed.Reg. at 52,695), will not be for application on remand as to that aspect of the case. The DSM–IV criteria will be for application on all other questions to which they are relevant, and the new diagnostic code criteria in 38 C.F.R. § 4.130 will be for application to establish the appropriate disability rating if the appellant's PTSD is found to be service connected—in each instance to the extent that those criteria are more favorable to the veteran. *See Hayes* and *Karnas,* both *supra.*

### III. Conclusion

Upon consideration of the record and the submissions of the parties, the Court vacates the May 2, 1994, BVA decision and reverses it in part, and remands the matter for expeditious further development and readjudication, on the basis of all applicable law and regulation, and issuance of a readjudicated decision supported by an adequate statement of reasons or bases, *see* 38 U.S.C. §§ 1154(b), 5107(a), (b), 7104(a), (d)(1), 7261; 38 C.F.R. §§ 3.304(f), 4.125 (Nov 96 amnds), 4.126 (1996), 4.130 (Nov 96 amnds); applicable MANUAL M21–1 provisions; *Fletcher, supra*—all consistent with this opinion and in accordance with section 302 of the Veterans' Benefits Improvements Act, Pub.L. No. 103–446, § 302, 108 Stat. 4645, 4658 (1994) (found at 38 U.S.C. § 5101 note) (requiring Secretary to provide for "expeditious treatment" for claims remanded by BVA or Court). *See Allday,* 7 Vet.App. at 533–34. "On remand, the appellant will be free to submit additional evidence and argument" on the remanded claim. *Quarles v. Derwinski,* 3 Vet.App. 129, 141 (1992). A final decision by the Board following the remand herein ordered will constitute a new decision which, if adverse, may be appealed to this Court only upon the filing of a new Notice of Appeal with the Court not later than 120 days after the date on which notice of the new Board final decision is mailed to the appellant.

REVERSED IN PART; VACATED IN PART; REMANDED.

NEBEKER, *Chief Judge,* concurring, by way of synopsis:

I compliment the author of this opinion for his time-consuming, detailed treatment of the issues raised or apparent in this appeal. However, the opinion's prolixity and, I fear as to other readers, its convolution may cause the holdings of the Court to be obscured or misunderstood. Thus, I take the liberty briefly to outline what I see as the holdings and remedies we fashion. In this decision, we separate the medical "apple"— the now-subjective sufficiency of stressors, as described by a veteran, for a medical diagnosis of PTSD—from the adjudicatory "orange"—the determination by the VA fact finders that the stressors actually took place, substantially as recounted by the veteran.

### Holdings

First, this claim of service connection for post-traumatic stress disorder (PTSD) is well

grounded: Mr. Cohen currently has this disability; the lay evidence of a stressor or stressors in service is presumed credible for the purpose of determining whether his claim is well grounded; and medical professionals have connected his current disability to his service, again presuming the credibility of the stressors he and his lay witnesses have recounted. *See Caluza v. Brown,* 7 Vet.App. 498, 506 (1995), *aff'd per curiam,* 78 F.3d 604 (Fed.Cir.1996) (table).

Second, during the pendency of this appeal, VA has adopted, through rulemaking or policy, more current diagnostic criteria for PTSD, moving from those in the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, third edition, to the revised third edition [DSM–III–R], to the fourth edition [DSM–IV]. The revision to the diagnostic criteria of the DSM–IV, made by a new regulation, has not changed 38 C.F.R. § 3.304(f), the PTSD regulation, but the new regulation amends 38 C.F.R. § 4.125 and § 4.126. The Secretary has also replaced 38 C.F.R. § 4.130 with a new section that specifically notes that the nomenclature employed in the rating schedule is based on DSM–IV. However, VA adjudicators also are guided by the VA ADJUDICATION PROCEDURE MANUAL, M21–1 [hereinafter MANUAL M21–1]. The MANUAL M21–1 continues to apply the criteria set forth in the DSM–III–R. If these provisions are deemed not consistent in any respect, Mr. Cohen must receive the benefit of the most favorable version. *See Karnas v. Derwinski,* 1 Vet.App. 308, 312–12 (1991).

Third, the Court takes judicial notice of the effect of this shift in diagnostic criteria. The major effect is this: the criteria have changed from an objective ("would evoke . . . in almost anyone") standard in assessing whether a stressor is sufficient to trigger PTSD, to a subjective standard. The criteria now require exposure to a traumatic event and a response involving intense fear, helplessness, or horror. A more susceptible individual may have PTSD based on exposure to a stressor that would not necessarily have the same effect on "almost anyone." The sufficiency of a stressor is, accordingly, now a clinical determination for the examining mental health professional.

Fourth, where, as in Mr. Cohen's case, there has been an "unequivocal" diagnosis of PTSD by mental health professionals, the adjudicators must presume that the diagnosis was made in accordance with the applicable DSM criteria as to both adequacy of symptomatology and sufficiency of the stressor (or stressors). In examining these diagnoses, the adjudicators may reject a claim only upon finding a preponderance of the evidence against a PTSD diagnosis, against the occurrence of in-service stressor(s), or against the connection of the present condition to the in-service stressor(s).

Fifth, the Board must return a diagnostic report to the regional office (RO) for a further report by the examining doctor or other mental health professional when the Board believes the report does not accord with applicable DSM criteria. Here, the Board did not return the diagnostic reports on Mr. Cohen for clarification, despite expressed doubts regarding the adequacy of the PTSD diagnoses, specifically, the sufficiency of the stressor noted in the reports. Moreover, the Board did not discuss each of the three diagnostic reports in the record and failed to provide an adequate statement of reasons or bases for rejecting the examining medical professionals' conclusions that Mr. Cohen has PTSD.

Accordingly, the Court reverses the BVA as to its rejection of the diagnosis of PTSD. This holding necessarily requires the conclusion that the stressors, as recounted by Mr. Cohen, were medically sufficient. The Board erred in finding the stressors insufficient and rejecting the diagnoses.

### Remedy

Since the Court is precluded from finding fact, we must return this case to the BVA for the determination on the third essential regulatory element for service-connection of PTSD (that is, the link of the veteran's current PTSD symptomatology to a specific stressor found to have occurred) and perhaps as to the second essential regulatory element (that is, the occurrence of the stressor(s) reported by Mr. Cohen). He has identified a number of stressors. One of these stressors, the mortar attacks, has been corroborated by a lay witness, whom the BVA has found

credible. The occurrence of this stressor has thus been established on this record. If a link is found between this stressor and the veteran's current PTSD, no further inquiry need be made. If not, and if the Board finds that Mr. Cohen was "engaged in combat" upon his return to the Da Nang air base from leave (or with respect to other stressors asserted, but not established), the relaxed evidentiary standards set forth in 38 U.S.C. § 1154(b) apply. Otherwise, verification of any such stressor is needed, and the Board must carry out its duty to assist Mr. Cohen in obtaining corroborating evidence from the Environmental Support Group, based, for example, on Mr. Cohen's more specific information about his being fired upon at the Da Nang air base. If the Board requires more evidence concerning nexus to a specific in-service stressor of Mr. Cohen's current symptoms, it must return the PTSD diagnosing reports to the examining mental health professional for clarification and, if needed, obtain further medical evidence on this issue.